BINGHAM MCCUTCHEN LLP
TODD E. GORDINIER, STATE BAR NO. 82200
todd.gordinier@bingham.com
JASON H. ANDERSON, STATE BAR NO. 172087
jason.anderson@bingham.com
600 Anton Blvd., 18th Floor
Costa Mesa, CA  92626
Telephone: (714) 830-0600
Fax: (714) 830-0700

JASON R. ERB, STATE BAR NO. 180962
JasonErb@hmausa.com
HYUNDAI MOTOR AMERICA
10550 Talbert Ave.
P.O. Box 20850
Fountain Valley, CA  92728-0850
Telephone: (714) 965-3393
Fax: (714) 965-3815

Attorneys For Defendant
HYUNDAI MOTOR AMERICA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| MICHAEL PARKINSON, et al. on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>        v.<br><br>HYUNDAI MOTOR AMERICA, a California Corporation,<br><br>                Defendant. | CASE NO. SACV 06-345-AHS (MLGx)<br><br>Hon. Alicemarie H. Stotler<br><br><br>**DEFENDANT HYUNDAI MOTOR AMERICA'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:    August 4, 2008<br>Time:    10:00 a.m.<br>Ctrm:    Ctrm 10A |

A/72578669.1

1

## TABLE OF CONTENTS

2

Page

3    I.    INTRODUCTION ........................................................................1

4    II.    STATEMENT OF FACTS...........................................................2

5         A.    The 2003 Tiburon was Built with Top Flight Clutch Parts .................2

6         B.    The "Lifespan" of a Clutch Disc and its Surrounding

7              Components is Dependent Upon Highly-Individualized Factors........3

8         C.    Clutch Warranty Decisions are Individualized and Not

9              Susceptible to Class Treatment ............................................4

10         D.    Plaintiffs' Unique Factual Circumstances Predominate ....................6

11              1.    Schroeder Made Substantial, Performance Enhancing

12                   Modifications ..............................................................6

13              2.    Sano Had His Friend Repair His Clutch In Knowing

14                   Violation Of The Terms of His Warranty..................................8

15              3.    Gorman Purchased a Used Tiburon, Made Aftermarket

16                   Performance Modifications And Raced His Car ......................9

17              4.    Matuschek Declined A Dealer Inspection Of The Clutch

18                   And Repaired It Himself Without Any Warranty Claim.........10

19              5.    Parkinson Installed Aftermarket Clutch Parts After Being

20                   Warned He Could Void His Warranty....................................12

21         E.    Plaintiffs' Mischaracterized the Nature and Extent of HMA's

22              Reports to Dealers and to HMC .......................................13

23    III.    PLAINTIFFS FAILED TO MEET THEIR BURDEN OF SATISFYING

24         THE REQUIREMENTS OF RULE 23(a) ..................................................14

25    IV.    PLAINTIFFS FAILED TO DEMONSTRATE THAT COMMON

26         QUESTIONS OF FACT OR LAW PREDOMINATE OR THAT CLASS

27         PROCEDURE IS SUPERIOR UNDER RULE 23(b)(3)...........................16

28

-i-

1

<u>TABLE OF CONTENTS</u>
(continued)

2

Page

3   A.   Individual Factual Issues Predominate .............................................. 16

4        1.   Plaintiffs Have Not Established They Can Prove A

5             Common Defect ......................................................................... 16

6        2.   Individual Issues Will Predominate Respecting the Cause

7             of Clutch Issues And Whether Warranty Coverage Was

8             Voided And/Or Properly Denied ............................................... 20

9             a.   Causation Cannot Be Established On A Class-

10                 Wide Basis Given Individualized Driving Habits

11                 And Conditions ............................................................. 21

12            b.   Causation Cannot Be Established On A Class-

13                 Wide Basis Given Individualized Modifications .......... 22

14            c.   Individualized Defenses Will Also Predominate .......... 22

15       3.   Individual Representations And Individual Questions Of

16            Reliance Predominate In Plaintiffs' Alleged Scheme To

17            Deny Warranty Coverage Claim ............................................... 24

18  B.   Application Of Each State's Differing And Varying Consumer

19       Protection, Warranty, And Concealment Laws Precludes A

20       Finding Of Common Legal Issues ...................................................... 26

21       1.   Certification Is Improper Where All Class Members Are

22            Not Governed By The Same Legal Standards ........................... 26

23       2.   The Due Process And Choice Of Law Issues In This

24            Case Overwhelm Any Common Legal Issues ........................... 26

25       3.   California Law May Not Be Applied To Non-California

26            Class Member Claims ................................................................ 27

27

28

-ii-

1

TABLE OF CONTENTS
(continued)

2                                                                                    Page

3                    a.    The Application Of California Law To All Non-

4                          California Class Member Claims Is

5                          Unconstitutional ...........................................................27

6                    b.    California Law Requires That The Warranty

7                          Contract Be Interpreted According To The Law

8                          Where Each Tiburon Was Purchased............................29

9                    c.    California Choice Of Law Rules Do Not Permit

10                         The Application Of California Law To The Other

11                         Claims ..........................................................................30

12              4.    Plaintiffs Fail To Satisfy Their Burden Of Establishing

13                    That This Case Is Manageable Based On The Differences

14                    In Applicable Law ..................................................................33

15         C.    Class Procedure Is Not Superior .......................................................34

16   V.    CONCLUSION ..........................................................................................35

17

18

19

20

21

22

23

24

25

26

27

28

A/72578689.1

# TABLE OF AUTHORITIES

## FEDERAL CASES

Page(s)

*In re American Medical Systems, Inc.*,
75 F.3d 1069 (6th Cir. 1996) ...................................................................... 14, 15

*Apanewicz v. General Motors Corp.*,
80 F.R.D. 672 (E.D. Pa. 1978) ............................................................................ 15

*Arabian v. Sony Electronics Inc.*,
No. 05-CV-1741 WQH(NLS), 2007 WL 627977, at *38-39 (S.D. Cal.
Feb. 22, 2007) ................................................................................... 20, 30, 33

*Armour v. City of Anniston*,
89 F.R.D. 331 (N.D. Ala. 1980) .......................................................................... 15

*In re Bridgestone/Firestone Tire Pros. Liab. Litig.*,
288 F.3d 1012 (7th Cir. 2002) ................................................................. 26, 32, 35

*Castano v. American Tobacco Company*,
84 F.3d 734 (5th Cir. 1996) ............................................................................... 27

*Chin v. Chrysler Corporation*,
182 F.R.D. 448 (D.N.J. 1998) ........................................................... 26, 31, 32, 35

*Cole v. General Motors Corp.*,
484 F.3d 717 ...................................................................................... 31, 33

*Costco Wholesale Corp. v. Liberty Mutual Ins. Co.*,
472 F. Supp. 2d 1183 (S.D. Cal. 2007) ..................................... 30, 31, 32, 33

*Davis v. Thornburgh*,
903 F.2d 212 (3d Cir. 1990) .......................................................................... 15

*Dhamer v. Bristol-Meyers Squibb Co.*,
183 F.R.D. 520 (N.D. Ill. 1998) .......................................................................... 25

*Estate of Felts v. Genworth Life Ins. Co.*,
No. C06-1419RAJ, 2008 WL 2138435 (W.D. Wash. April 14, 2008) ............. 26

*Fitting v. Dell, Inc., No. CVA06-23-S-LMB*,
2008 WL 2152233 (D. Idaho May 21,  2008) .................................................. 23

*In re Ford Motor Co. Bronco II Product Liability Litig.*,
177 F.R.D. 360 (E.D. La. 1997) ........................................................... 15, 16, 27

*In re Ford Motor Co. Vehicle Paint Litig.*,
182 F.R.D. 214 (E.D. La. 1998) .......................................................................... 34

*Gartin v. S & M NuTec LLC*,
245 F.R.D. 429 (2007) ......................................................................... 26, 27, 30

*General Tel. Co. of Southwest v. Falcon,*
   457 U.S. 147, 102 S. Ct. 2364 (1982)................................................................14

*Glover v. BIC Corp.,*
   6 F.3d 1318 (9th Cir. 1993) ......................................................................24

*Hanon v. Dataproducts Corp.,*
   976 F.2d 497 (9th Cir. 1992) ..............................................................14, 22

*Kaczmarek v. IBM Corp.,*
   186 F.R.D. 307 (S.D.N.Y. 1999) ..............................................................19

*Long v. Sears Roebuck & Co.,*
   877 F. Supp. 8 (D.D.C. 1995)....................................................................30

*Lyon v. Caterpillar, Inc.,*
   194 F.R.D. 206 (E.D. Pa. 2000)................................................................32

*Parks Automotive Group, Inc. v. General Motors,*
   237 F.R.D. 567 (D.S.C. 2006) ..................................................................25

*In re Paxil Litigation,*
   212 F.R.D. 539 (C.D. Cal. 2003)..............................................................33

*Phillips Petroleum Co. v. Shutts,*
   472 U.S. 797 (1985)..................................................................................27

*Randazzo v. Harris Bank Palatine, N.A.,*
   262 F.3d 663 (7th Cir. 2001) ..................................................................24

*Samuel-Bassett v. Kia Motors America,*
   212 F.R.D. 271 (E.D. Pa. 2002)..........................................................17, 18

*Sanneman v. Chrysler Corp.,*
   191 F.R.D. 441 (E.D. Pa. 2000)..........................................................20, 34

*Saval v. BL, Ltd.,*
   710 F.2d 1027 (4th Cir. 1983) ..................................................................21

*Scott v. Fairbanks Capital Corp.,*
   284 F. Supp. 2d 880 (S.D. Ohio 2003) ....................................................24

*Sheris v. Nissan North America, Inc.,*
   Civ. No. 07-2516, 2008 WL 2354908 (D.N.J. June 3, 2008)....................31

*In re St. Jude Medical, Inc.,*
   425 F.3d 1116 (8th Cir. 2005) ............................................................26, 32

*Tidwell v. Thor Industries, Inc. (Civil No. 05-CV-2088-LLBLM),*
   2007 U.S. Dist. LEXIS 21819 (S.D. Cal. March 26, 2007) ......................22

*Walsh v. Ford Motor Company,*
   130 F.R.D. 260 (D.D.C. 1990) ............................................................16, 19

*In re Worldcom, Inc..*,
  343 B.R. 412 (Bankr. S.D.N.Y. 2006) .................................................................32

*Zinser v. Accufix*,
  253 F.3d 1180 (9th Cir. 2001) ............................................................................26

**STATE CASES**

*American States Ins. Co. v. Tokai-Seiki (H.K.), Ltd.*,
  94 Ohio Misc. 2d 172 (1997) ..............................................................................24

*American Suzuki Motor Corp. v. Superior Court*,
  37 Cal. App. 4th 1291 (1995) .............................................................................21

*Anthony v. General Motors Corp.*,
  33 Cal. App. 3d 699 (1973) ................................................................................17

*Caro v. Procter & Gamble Co.*,
  18 Cal. App. 4th 644 (1993) ...............................................................................34

*Cedars-Sinai Medical Center v. Superior Court*,
  18 Cal. 4th 1 (1998) ...........................................................................................24

*Clothesrigger v. GTE Corp.*,
  191 Cal. App. 3d 605 (1987) ..............................................................................27

*Cox House Moving, Inc. v. Ford Motor Co*,
  CA No. 706-1218-HMH, 2006 WL 3230757 (D.S.C. Nov. 6, 2006) ..............20

*Dean Witter Reynolds, Inc. v. Superior Court*,
  211 Cal. App. 3d 758 (1989) ..............................................................................34

*In re GMC "Piston Slap" Products Liab. Litig., No. MDL 04-1600*,
  2006 WL. 1049259 (W.D. Okla. April 19, 2006) ...........................15, 21, 22, 35

*Lantz v. American Honda Motor Co.*,
  No. 06C5932 2007 WL1424614 (N.D. Ill. May 14, 2004)...............................30

*Norwest Mortgage, Inc. v. Superior Court*,
  72 Cal. App. 4th 214 (1999) ....................................................................27, 28, 33

*Reese v. Wal-Mart Stores, Inc.*,
  73 Cal. App. 4th 1225 (1999) .............................................................................34

*Stetser v. TAP Pharmaceutical Products, Inc.*,
  165 N.C. App. 1 (2004) ......................................................................................32

*Torres v. Matsushita Elec. Corp.*,
  762 So. 2d 1014 (Fla. 5th Dist. Ct. App. 2000)................................................24

*Wash. Mut. Bank v. Superior Court*,
  24 Cal. 4th 906 (2001) ..............................................................................28, 30, 32

*Western Gulf Oil Co. v. Title Ins. & Trust Co.*,
  92 Cal. App. 2d 257 (1949) ................................................................................24

A/72578669.1

# FEDERAL STATUTES

15 U.S.C. § 2310(a)(3)(C)(ii) ...................................................................31

Fed. R. Civ. P. 23 ...................................................................................35

Fed. R. Civ. P. 23(a)........................................................................14, 15

Fed. R. Civ. P. 23(b)(3)...........................................................................16

# STATE STATUTES

Business & Professions Code § 17200 ....................................................34

Civil Code section 1646...................................................................29, 30

A/72578669.1

# I.   INTRODUCTION

Plaintiffs' motion for class certification should be denied because factual and legal issues unique to each will predominate in any trial to determine whether each plaintiff's claimed clutch problem was due to a defective part or parts[1] and, further, whether warranty coverage was improperly denied.  Plaintiffs' claims are not even typical of each other, let alone the proposed class, and each is subject to at least one unique defense which nullifies their warranty claims.  Moreover, cost effective means for resolving any individual disputes related to alleged clutch problems are readily available and have already been employed to efficiently resolve the sort of claims here without either the inherent costs or the inevitable morass of legal conflicts that would accompany a proposed nationwide class.

Individual issues predominate at every step of the factual and legal analysis required to adjudicate this matter.  First, and most basically, there is not another part in a car more susceptible to individualized behavior than the clutch.[2]  The life expectancy of clutch parts depends heavily upon each person's driving habits and the conditions under which each car is driven, as well as whether any performance related modifications have been made to the car.  It is precisely for this reason that Hyundai (and every other car manufacturer, "OEM") limits the warranty for clutch parts.

Second, a driver encountering any issue with their car takes the vehicle to one of the 794 individually owned and operated Hyundai dealers throughout the country.  The diagnostic decision about whether repair is needed and, if so, what

---

[1]     Noticeably absent from plaintiffs' Complaint, discovery responses, and motion is any identification of what is purportedly defective about any of the clutch parts.

[2]     Plaintiffs' Complaint coins a term, "flywheel system," which is carried into this motion but does not appear anywhere in any of the written warranty materials.  Plaintiffs' use of the non-existent term "flywheel system" is illustrative of their attempt to gloss over the inevitable and unavoidably ubiquitous individualized issues of proof inherent in this action.

parts to replace, as well as the decision to allow or deny a warranty claim is made by the individual dealer (not by Hyundai Motor America ("HMA")) in response to what personnel (often it is both the manager and the service technician evaluating the vehicle) see of the car and hear from the owner when it is brought in.  The reason for acceptance or denial of warranty coverage is as individualized as the proffered explanations by drivers respecting their particular problem.  Moreover, the four clutch parts about which plaintiffs complain have been manufactured in fifteen different configurations for the production life of the 2003 Tiburon.  Significantly, from available data, over 80% of the owner claims made for clutch damage regarding the 2003 Hyundai Tiburon were, in fact, paid under warranty.

The individualized nature of these claims is best seen by looking at the named plaintiffs, each of whom has his own set of individualized circumstances that uniquely impacted the life expectancy of his particular clutch parts and the denial of warranty coverage.  Although plaintiffs may quarrel with the denial of warranty coverage, each decision appears to be correct.  What is indisputable, however, is that each decision presents individualized situations that cannot be properly adjudicated on a class basis, much less a nationwide class in which the multiplicity of state warranty and consumer protection laws would compound the factual variances.

## II.   STATEMENT OF FACTS

### A.   The 2003 Tiburon was Built with Top Flight Clutch Parts

The 2003 Hyundai Tiburon vehicles were equipped with a 2.7 liter, V6 engine and had four parts that are at issue here: (1) a clutch disc (lining), (2) a dual-mass flywheel, (3) a clutch cover (pressure plate), and (4) a release bearing. (Johnson Dec., ¶4 & Ex. 1 [visual illustration of components]; Starksen Dec., ¶7 & Ex. 3 [diagram depicting components].)  In the course of the production of the 2003 Tiburon, successive changes were made to the design of the clutch disc, clutch cover, and flywheel.  (Johnson Dec., ¶13.)  As a result, there are fifteen (15)

1   different component configurations within the clutch assembly amongst the

2   putative class members, further illustrating the impracticality of class-wide

3   treatment of these claims.  (*Id.*)

4        The Tiburon's clutch disc, clutch cover and release bearing were developed,

5   manufactured and supplied by Valeo, one of the premier clutch parts suppliers in

6   the world.  The Tiburon's dual-mass flywheel was supplied by LuK Group, which

7   is widely recognized as a premier clutch part supplier.  The LuK Group has

8   manufacturing facilities around the world and supplies original equipment,

9   clutches, discs, and flywheels to automobile manufacturers that include Audi,

10  Austin Martin, BMW, Chrysler, Fiat, Ford, General Motors, Jaguar, Mazda,

11  Mercedes Benz, Nissan, Opal, Porsche, Peugeot, Renault, Range Rover, Toyota,

12  Volvo and Volkswagen.  (Starksen Dec., ¶¶12-15.)

13       The design of these component parts was sound, the parts were procured

14  from internationally recognized suppliers and each was subjected to rigorous

15  laboratory testing during development.[3]  As a result, the clutch components for the

16  2003 Tiburon are not defective in design, were of merchantable quality, and were

17  fit for their ordinary purpose.  (Starksen Dec., ¶15.)

18   **B.   The "Lifespan" of a Clutch Disc and its Surrounding Components**

19   **is Dependent Upon Highly-Individualized Factors**

20       In the Tiburons at issue here, as in all manual transmission vehicles, the

21  engine is connected to the transmission by the clutch and the flywheel.  In

22  simplistic terms, the clutch is a bridge - literally and figuratively - between the

23  vehicle's transmission and engine.  The clutch and its component parts engage and

24  disengage the engine from the transmission, enabling the driver to start, stop, idle

25  _____

26  [3]    This testing exceeds industry norms and allows each of the Tiburon's clutch
    components to be certified under applicable standards prescribed by the Society of
27  Automotive Engineers. (Starksen Dec., ¶13.)  Beyond supplier testing, however,
    Hyundai Motor Company in Korea also subjected the components to further testing
28  during the development of the Tiburon vehicle.  (*Id.*)

-3-

1   in neutral and shift gears.  When the clutch is completely engaged, the transmission

2   input shaft and engine crank shaft rotate together at the same speed, transmitting

3   the energy of the engine to the transmission and ultimately to the wheels.

4   (Starksen Dec., ¶¶7-11.)

5          How a vehicle is driven is a primary factor in the lifespan of a clutch.

6   Constant engagement and disengagement of the clutch will wear away disc friction

7   material.  The wear rate depends largely on the driving habits of the operator,

8   vehicle usage, and driving environment.  (Starksen Dec., ¶¶16-17 - "*there is no*

9   *accepted figure for expected life span of a new clutch (whether in terms of mileage*

10  *or days or years of usage)*.")  For example, all other things being equal, a vehicle

11  that is subject to stop-and-go traffic or is often driven in hilly environments will

12  experience a higher clutch wear rate than a vehicle that is predominately driven for

13  long distances on level surfaces.  (*Id.*)  There are also many driving habits that can

14  lead to premature clutch wear.  Indeed, an operator's level of driving skill - to

15  make smooth gear shifts without substantial slipping of the clutch - is critical to the

16  expected life of the clutch assembly.  It is not an exaggeration to say that a clutch

17  can be ruined by 30 seconds of misuse or abuse.  (*Id.* at ¶¶18-19.)

18         **C.**   **Clutch Warranty Decisions are Individualized and Not**
19              **Susceptible to Class Treatment**

20         The Tiburon, including the 2003 model at issue here, was designed and

21  manufactured in Korea by Hyundai Motor Company (not a party here), shipped to

22  this country via ports in many different states and sold by 794 authorized dealers

23  throughout the country - each one independently owned and operated.  (Johnson

24  Dec., ¶8 - "*Of the current dealers, approximately eight percent (8%) are located in*

25  *California.*")

26         HMA does not provide warranty service diagnoses or repairs for retail

27  customers.  (Johnson Dec., ¶8; Brown Dec., ¶8 - "*In the automotive industry, the*

28  *OEM auto manufacturer, or its United States affiliated distributor, ordinarily does*

-4-

*not provide warranty service diagnosis or repairs for retail customers.*")
Diagnoses of clutch issues are both complex and highly individualized and involve
an examination of individual component parts, a mechanic or service technician
discussing the symptoms of clutch operation with the customer and often road
testing the vehicle with the customer driving to replicate the symptoms.[4]   (Johnson
Dec., ¶9 - "*HMA also does not provide or dictate specific diagnoses for vehicle
clutch conditions*"; Starksen Dec., ¶¶27-30 & Ex. 11 [LuK diagnostic guide
containing seventeen pages of diagnostic guides and photographs of thirty-two
different conditions and corresponding causes for a technician to evaluate]; Brown
Dec., ¶¶9-12 - HMA's practices "*conform to industry norms and customs.*")

  The warranties provided for the components of the clutch are contained
within the 2003 Tiburon Owner's Handbook.  (Johnson Dec., ¶5 & Ex. 2 [Owner's
Handbook].)  The clutch disc is warranted as a normal maintenance item for 12
months or 12,000 miles, whichever occurs first.  The flywheel, clutch cover and
release bearing, by contrast, are covered for the earlier of 10 years or 100,000
miles (for original owners - successive owners, for the earlier of 5 years or 60,000
miles).  Hyundai's warranty coverage is neither unlimited nor ambiguous.  (*Id.* at
¶6; Brown Dec., ¶13 - "*there is nothing unusual about an OEM disclaiming
warranty coverage for a repair that is . . . necessitated by . . . lack of proper
maintenance, abusive driving, a prior accident, or modifications to the vehicle.*")
Specifically, like every other automobile manufacturer, HMA does not provide
warranty coverage where there is evidence of lack of proper maintenance, abusive
driving, a prior accident, or relevant modifications to the vehicle.  (Johnson Dec. at
¶¶6-7 & Ex. 3 [excerpts of Owner's Manual, which also cautions and warns

---

[4] HMA only becomes involved in a dealer's determination of warranty
coverage when a customer disputes the dealer's determination or when the dealer
requests HMA's assistance in a particularly difficult vehicle condition diagnosis.
In these instances, the dealer involves one of 62 HMA district parts and service
managers located throughout the United States.  (Johnson Dec., ¶10.)

1    customers of the consequences of making modifications to their cars].)

2         The individual dealer decisions reached for the representative plaintiffs

3    were, in HMA's view, correct in each instance.  As can be readily seen, however,

4    each diagnosis and resulting decision concerning warranty coverage is not only

5    highly individualized but dependent upon a review of the vehicle and an evaluation

6    of the owner's driving habits.  (Starksen Dec., ¶¶27-30; Brown Dec., ¶13 - "*These*

7    *determinations are made on a case-by case basis*.")

8         **D.    Plaintiffs' Unique Factual Circumstances Predominate**

9         A review of the facts unique to the representative plaintiffs illustrates the

10   individualized nature of their clutch components' conditions and their

11   corresponding diagnoses, repairs and warranty coverage decisions rendered by

12   their servicing dealers (for some, entirely without dealer involvement).  Nor is this

13   limited to the representative plaintiffs.  More than 600 2003 Tiburon owners claim

14   to have made aftermarket modifications to their vehicles.  (Erb Dec. ¶¶1-8, Ex. 2).

15        **1.    Schroeder Made Substantial, Performance Enhancing**

16               **Modifications**

17        Plaintiff Donn Schroeder is a resident of Maryland.  (Anderson Dec., Ex. A

18   [Schroeder Depo. at 6:18-20 & 7:19-20].)  Schroeder purchased his new 2003

19   Tiburon from a Maryland dealer in March 2003.  (Anderson Dec., Ex. B

20   [Schroeder purchase contract].)  As it happens, the Tiburon is among a handful of

21   relatively inexpensive sports coupe-type vehicles in the United States market with

22   a dedicated group of "tuner" enthusiasts.  (Erb Dec., ¶¶1-8 & Exs. 1-7.)  The tuner

23   market is devoted to modifying original equipment vehicles for performance

24   enhancing and in some cases racing uses.  (*Id.*)  Within the automotive industry

25   and in particular the automotive aftermarket there is widespread evidence of

26   modifications by some portion of Tiburon owners to their vehicles together with

27   what is clearly aggressive if not abusive driving.  (*Id.*)  Examples of such

28   modifications and uses are found in the posting at websites such as

www.newtiburon.com, www.floridatibs.com, www.crookedH.com, www.hyundaihouseofpower.com, www.dfyhyundais.com, and www.hyundaiperformance.com.  (*Id.*)

Schroeder is an active member in this Tiburon "sub-culture" and has made an extensive amount of modifications to his car.  (Anderson Dec., Ex. A [Schroeder Depo. at 62:12-66:12 and 91:2-96:17].)  These include cosmetic changes (*e.g.*, aftermarket hood, tail lights, fuel door filler and gull wing doors) and purely performance inspired alterations (front air dam, exhaust system, cold air intake system, and racing strut bar).  (*Id.* at 34:20-35:4, 38:12-62:11] & Ex. C [records relating to purchase of aftermarket parts].)  As Schroeder conceded, the primary reason for these latter modifications was to increase the car's engine performance, specifically its horsepower.  (Anderson Dec., Ex. A [Schroeder Depo. at 42:3-14].)

Schroeder is also a member and frequent visitor of the newtiburon.com website where he has posted over 700 comments[5] including the following comment regarding his modified hood: "*I've got a VIS invader CF hood and do not have hood pins.  I've had it on since June and speeding on the highway.  It flutters a bit at high speeds…. .*"  (Anderson Dec., Ex. D)  Indicative of his aggressive if not abusive driving habits are the facts that he has received speeding tickets and has also gone through four sets of tires.  (Anderson Dec., Ex. A [Schroeder Depo. at 25:20-27:14 & 73:11-13].)

He drove his car without incident - respecting the clutch - for approximately 53,000 miles.  (*Id.* at 75:10-23 & Ex. E [service record].)  When he took it to his New Market, MD dealership, they advised him that the clutch was worn out and that there was no warranty coverage.  (*Id.* at 79:4-81:6, 89:8-14, 90:1-22.]

---

[5]    Although he filed this suit in 2006, because Schroeder made no effort to preserve evidence, all of Schroeder's comments prior to January 2007 have been lost.

1   Schroeder instructed the dealership to make the repair - at no time did he contest

2   the warranty decision either with the dealership or HMA.  (*Id.* at 90:1-22; 101:15-

3   23].)  Schroeder did not retain or photograph these original components.  (*Id.* at

4   96:18-21].)

5       That clutch lasted another 50,000 miles at which point, in December 2007,

6   he purchased an aftermarket, high performance clutch and flywheel and had them

7   installed by an unauthorized auto shop.  (Anderson Dec., Ex. A [Schroeder Depo.

8   at 104:8-105:23, 108:6-111:22 & Ex. E [records re installation of aftermarket

9   clutch]); *see also* Starksen Dec., ¶¶31-34 & Exs. 12-14 - there is conclusive

10  evidence that the clutch experienced extreme heat that is not normal and ordinarily

11  associated with abusive driving.)

12      **2.    Sano Had His Friend Repair His Clutch In Knowing**

13      **Violation Of The Terms of His Warranty**

14      Plaintiff Michael Sano is a resident of California who purchased a new 2003

15  Tiburon with a six speed manual transmission from a Concord, California dealer in

16  February 2002.  (Anderson Dec., Ex. F [Sano Depo. at 16:5-21] & Ex. G [Sano

17  purchase contract].)  He experienced no problems with his clutch while averaging

18  over 30,000 miles a year commuting through the hills of Berkeley each day for

19  more than three years.  (Anderson Dec., Ex. F [Sano Depo. at 18:19-20:17, 51:21-

20  25].)  He began experiencing issues with his clutch when his car reached 89,000

21  miles.  (*Id.* at 107:10-19] & Ex. H [service record relating to clutch].)  Sano took it

22  to his dealership who estimated upon initial inspection that the clutch would need

23  to be replaced - which Sano declined.  (Anderson Dec., Ex. F [Sano Depo. at

24  112:11-113:10, 115:11-13] & Ex. H.)  Consulting with a mechanic friend he opted

25  to have that friend make the repair with aftermarket parts that he concedes he knew

26  could void his warranty.  (Anderson Dec., Ex. F [Sano Depo. at 115:14-127:4 -

27  "*And did you understand then, from reading that handbook, that if you had*

28  *someone other than an authorized Hyundai dealership do the work, there could be*

-8-

1   *a potential that you wouldn't have warranty coverage? . . The Witness: Yes.*",
2   135:15-21, 136:10-25].)  Exacerbating this is the fact that a review of the clutch
3   housing now reveals that his mechanic friend blow-torched the clutch housing to
4   get at the clutch parts and then welded the piece back on after making the repairs -
5   needless to say, not an appropriate repair procedure even if that repair was needed.
6   (Starksen Dec., ¶44 & Ex. 16.)  Moreover, Sano testified that, since they were
7   removed, the parts have been subjected to testing, which HMA was unaware of
8   until the deposition and did not participate in.  (Anderson Dec., Ex. F [Sano Depo.
9   at 142:5-143:13].)

> ### 3.   Gorman Purchased a Used Tiburon, Made Aftermarket Performance Modifications And Raced His Car

12   Plaintiff Wesley Gorman, a resident of Florida, purchased a <u>used</u> 2003
13   Tiburon with a 6 speed manual transmission from a Miami Ford dealer in March of
14   2005.  (Anderson Dec., Ex. I [Gorman purchase contract].)  The vehicle had
15   41,008 miles on it at the time.  (*Id.*)  In the first month of his ownership, Gorman
16   had an aftermarket long form intake system installed by an independent facility for
17   the express purpose of adding additional horsepower to the vehicle.  (Anderson
18   Dec., Ex. J [Gorman Depo. at 55:1-57:7 - "*I just wanted to have more horsepower*
19   *for that car.*"])  Although denying that he ever abused his Tiburon, Gorman has
20   received a number of speeding tickets and bragged on the newtiburon.com website
21   that his top speed in the car was 125 mph, that the vehicle was also modified with
22   performance headers and a performance exhaust system (which he specifically
23   denied in his deposition), and that he subjected the vehicle to racing at a West
24   Palm Beach racetrack and street racing facility saying "*anytime I race a ricer [a*
25   *Japanese car] ... [I'd] say once a month at least ... they look and stare and we*
26   *light it up at the green*."  (Anderson Dec., Ex. J [Gorman Depo. at 43:24-44:4,
27   51:6-52:13 - "*I was really on that site only just to see what other people had to say*
28   *about (their clutch)*"; 62:14-17 - "*No. There was no other modification made*

1  *(other than tinted windows and the cold air intake)*"] & Exs. K [newtiburon.com

2  postings] & L [records related to unreported aftermarket modifications].)

3      On May 23, 2005, a Ft. Lauderdale, Florida Hyundai dealer told Gorman

4  that his clutch was failing and needed to be replaced.  (Anderson Dec., Ex. J

5  [Gorman Depo. at 70:10-71:5, 85:4-86:20, 88:1-10], & Exs. L, M & N [invoices

6  related to aftermarket clutch repair].)  That dealer, according to Gorman, told him

7  that the clutch simply "was not covered" under warranty.  (*Id.*)  Gorman then

8  racked up nearly 100 miles on the failing clutch by driving the vehicle from Fort

9  Lauderdale to Miami (where the Ford dealer from whom he had purchased the

10  vehicle also refused to warrant his clutch), back to his home in Margate, and then

11  to an aftermarket performance shop in Hialeah to have aftermarket, performance

12  clutch and flywheel components installed.  (*Id.*)

13      By June 2006, Gorman encountered trouble with his high performance,

14  aftermarket clutch.  After taking the vehicle to a different Hyundai dealer in

15  Coconut Creek, Florida, the high performance flywheel was found in a bent

16  condition, plainly exhibiting (to all but plaintiffs) abusive driving.  (Anderson

17  Dec., Ex. J [Gorman Depo. at 105:11-19, 108:9-16] & Ex. O [service record]); *see*

18  *also* Starksen Dec., ¶¶40-42.)  There is little question that Gorman's abusive

19  driving behavior was the source of his clutch troubles.  Illustrative of this behavior

20  is a quote from one of Gorman's posts on newtiburon.com:  "*I've read sooo much*

21  *about the stock Clutch and Flywheel ... it's gar[bage] ... seriously ... if you drive it*

22  *hard ... and most people with GT manual ... especially 6 speed does ... lets face it*

23  *... I don't red line it @ every stop light and stop sign ... but I drive it hard at times*

24  *... and I street race when it's 'safe' to do so ... if you know what I mean*."  (Erb

25  Dec. ¶10, Ex. 7 [Post 5/26/05, 4:51 p.m.]).

26      **4.    Matuschek Declined A Dealer Inspection Of The Clutch**

27      **And Repaired It Himself Without Any Warranty Claim**

28  Plaintiff Eric Matuschek is a resident of California.  (Anderson Dec., Ex. P

-10-

1  [Matuschek Depo. at 20:1-2].)  He is currently employed both as an automobile

2  mechanic and as a stunt driving specialist.  (*Id.* at 27:13-16, 28:25-26:14, 45:17-

3  23].)  He has a long history of racing cars, both on professional tracks and as a

4  stunt driver.  (*Id.* at 50:15-21, 52:12-17, 54:2-17, 56:4-23, 57:18-22].)

5      Matuschek purchased his 2003 Tiburon in Los Angeles in March 2003.

6  Although he claims to have never raced his Tiburon, he concedes that he has

7  received two moving violations in his Tiburon, including a speeding ticket.

8  (Anderson Dec., Ex. P [Matuschek Depo. at 78:5-25].)  With the exception of

9  some minor warranty work, which he had done at authorized dealerships and oil

10  changes which he had done at local oil change shops, Matuschek has performed all

11  of the repair and service work on his car himself.  (*Id.* at 104:17-105:9, 107:6-14,

12  109:3-24].)  This includes repairing and replacing the brakes at approximately

13  30,000 miles, replacing the tires at 30,000 miles, a tune up, and modifying the car

14  by adding a long form, aftermarket intake system.  (*Id.*)

15      He testified that he had no problems with the clutch the first 30,000 miles.

16  (*Id.* at 110:4-10].)  After experiencing problems shifting gears, he contacted at least

17  two dealerships about the problem.  Although both dealerships requested that he

18  bring his car in for inspection and diagnosis, he declined to do so; nor did he ever

19  make a warranty claim to either a dealership or HMA.  (*Id.* at 114:4-115:5, 117:3-

20  122:12, 134:23-135:6, 138:24-139:10, 140:7-16, 150:2-17].)  Instead, he made the

21  diagnosis and repair himself, in knowing violation of the warranty coverage using

22  an aftermarket high performance clutch kit together with a Hyundai flywheel.

23  (Anderson Dec., Ex. P [Matuschek Depo. at 122:14-124:18, 128:4-9, 131:22-25] &

24  Ex. Q [records relating to aftermarket clutch repair].)  Since Matuschek has made

25  all of the repairs to his car himself, saved no parts, and produced no pictures,

26  reconstructing an accurate history of the car is impossible.  (*Id*., Ex. P [Matuschek

27  Depo. at 131:22-25, 145:16-18]; Starksen Dec., ¶¶38-39.)

28

-11-

**5.** **Parkinson Installed Aftermarket Clutch Parts After Being Warned He Could Void His Warranty**

Plaintiff Michael Parkinson is a resident of Ohio who acknowledges being attracted to the Tiburon by virtue of its six speed manual transmission and its sports coupe being visually similar to the Porsche's and Ferrari's that he noticed while working as a parking valet.  (Anderson Dec., Ex. R [Parkinson Depo. at 14:6-8, 49:1-9] & Ex. S [Parkinson purchase contract].)  Despite acknowledging that he read and understood his Owner's Manual and knew that aftermarket modifications could void his warranty, he made a number of such modifications to his car shortly after he bought it.  (Anderson Dec., Ex. R [Parkinson Depo. at 58:14-59:3].)  These included an aftermarket intake system and exhaust tips, as well as a strut bar, all of which he purchased and installed himself, the latter by cutting away pieces of the engine covering and bolting the bar to the car.  (*Id.* at 66:4-67-4, 73:22-23, 74:22-25, 76:2-6, 79:23-14 - admitting he has failed to produce records in his possession regarding these modifications].)  Although he claims to have never raced the car, Parkinson acknowledges getting at least two speeding tickets in his Tiburon.  (*Id.* at 36:10-16].)

At approximately 30,000 miles, he was unable to shift the car into reverse from a parked position.  (*Id.* at 93:5-21].)  He then drove the car over thirty miles with a worn clutch to the dealership.  (*Id.* at 96:18-97:14, 100:6-18, 102:2-16].)  The dealer examined the car and asked him a number of questions about his driving habits; both the service technician and the manager concluded that the repair was not warranted.  (*Id.* at 105:11-110:12, 114:17-116:4, 120:8-14].)  Parkinson then purchased a high performance clutch kit and Hyundai flywheel over the internet and took them to the dealership to have them installed.  (*Id.* at 126:16-127:25] & Ex. T [clutch repair records].)  Parkinson concedes the dealership warned him that the use of aftermarket parts could bar him from warranty coverage before the parts were installed, but he nonetheless instructed

-12-

them to do so.  (*Id.* at 129:1-9; 134:17-135:17, 136:13-15].)  Parkinson did not

retain the original clutch parts, nor did he take any photographs of them.  (*Id.* at

141:8-12, 142:12-15]); *see also* Starksen Dec., ¶¶35-37 - "*Parkinson accurately*

*describes components whose condition are the direct result of what I consider*

*abusive driving . . .* ".)

### E.      Plaintiffs' Mischaracterized the Nature and Extent of HMA's Reports to Dealers and to HMC

HMA has no involvement in the design, engineering or production of the

subject vehicles or their component parts.  (Johnson Dec., ¶¶11-12.)  HMA acts as

a distributing arm for the sale of Hyundai cars in the United States.  In this role,

HMA distributes Technical Service Bulletins or "TSBs" to the independently

owned dealerships, as well as Quality Information Reports or "QIRs" to Hyundai

Motor Company.  (Johnson Dec., ¶¶14-15, 25.)

A TSB is a form in which HMA seeks to communicate diagnostic changes

and product and technical changes or issues with its dealers.  (Johnson Dec., ¶¶14-

15.)  They are not product recall communications or communications of defects.

HMA has distributed 195 TSBs applicable to the 2003 Tiburon on a wide range of

topics, including a decoder for vehicle identification numbers, a fuel mileage

calculator, the codes corresponding to the Tiburon's paint colors and, like the

clutch assembly part number TSB so heavily relied upon by plaintiffs, various part

number changes and updates to HMA's catalog.  (*Id.*)

The QIRs produced in this country are intended to convey information

observed in the field by HMA's various service department personnel to Hyundai

Motor Company in Korea.  (Johnson Dec., ¶25.)  In fact, the function of the QIRs

is to locate, observe and describe the nature of the apparent vehicle condition as it

is observed.  (*Id.*; Brown Dec., ¶14.)  Beyond observations, these QIRs are

intended to provide related assumptions--akin to "brainstorming" possible

relationships to the vehicle condition -- that may assist Hyundai Motor Company

-13-

1  in evaluating the design and making improvements.  (*Id.*)  It is not HMA's role to

2  diagnose flaws in design, manufacturing or assembly, and HMA's QIRs do not

3  provide any such analysis.  (*Id.*)

4      Contrary to plaintiffs' incorrect assertions about both the purpose and

5  substance of TSBs and QIRs, no HMA TSB or QIR has identified any common

6  failure mode or mechanism in the design of the Tiburon clutch, this is not HMA's

7  role anyway, and the nature and substance of the reports themselves would not and

8  do not evidence such.  (Brown Dec., ¶¶14-15; Johnson Dec., ¶¶14-25 - "*I was the*

9  *National Manager of Service Engineering, and I either authored, edited, or*

10  *reviewed the QIRs (or portions thereof) myself . . . I am confident when I say that*

11  *HMA has never identified (then or to date) any common failure mode or*

12  *mechanism in the design of the Tiburon clutch assembly*.")

13  **III.   PLAINTIFFS FAILED TO MEET THEIR BURDEN OF SATISFYING**

14  **THE REQUIREMENTS OF RULE 23(A)**

15      A class action "may only be certified if the trial court is satisfied, **after a**

16  **rigorous analysis**, that the prerequisites of Rule 23(a) have been satisfied [by

17  plaintiffs]."  *General Tel. Co. of Southwest v. Falcon*, 457 US 147, 161, 102 S. Ct.

18  2364, 2372 (1982) (emphasis added); *see also Hanon v. Dataproducts Corp.*, 976

19  F. 2d 497, 508 (9th Cir. 1992).

20      Plaintiffs' restatement of the basic standard for numerosity (as well as the

21  other requirements of Rule 23(a)) and their conclusory assertion that an undefined

22  "many" are in the proposed class is legally insufficient to sustain their burden.  *See*

23  *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996) ("Mere

24  repetition of the language of Rule 23(a) is not sufficient.").  Significantly, over

25  80% of the owner claims made for a clutch related repair on the 2003 GT Tiburon

26  were, in fact, paid under warranty.  (Johnson Dec., ¶19.)

27      Moreover, HMA has no way of identifying those owners who may have

28  been denied warranty coverage and subsequently had their vehicle's clutch

-14-

1    assembly replaced at a non-Hyundai dealer (such as Gorman, Sano, and Schroeder)

2    and those owners who performed their own repairs without ever contacting HMA

3    (such as Matuschek).  (*Id.*)  Plaintiffs have not demonstrated that either they or

4    HMA can ascertain members of the class under these circumstances.  *See In re*

5    *GMC "Piston Slap" Products Liab. Litig.*, No. MDL 04-1600 2006 WL 1049259,

6    at *3 (W.D. Okla. April 19, 2006) (no certification where records insufficient to

7    locate class members).

8          The considerations for the remaining Rule 23(a) factors, *i.e.*, commonality,

9    typicality and adequacy of representation, in many respects overlap.  *Davis v.*

10   *Thornburgh*, 903 F. 2d 212, 233 n. 18 (3d Cir. 1990).  The lack of credible, class-

11   wide proof of a common defect, individual factual issues regarding each plaintiff's

12   driving habits and conditions, vehicle modifications, and defenses, as well as

13   conflicts in applicable state law, preclude a finding that plaintiffs met their burden

14   simply by asserting the basic requirement and then stating in general, conclusory

15   terms that they have been satisfied.  *See In re American Medical Systems*, 75 F.3d

16   at 1080-81 (finding that plaintiffs' general and conclusory assertions of

17   commonality failed to satisfy the requirements of Rule 23(a)); *In re Ford Motor*

18   *Co. Bronco II Product Liability Litig.*, 177 F.R.D. 360 (E.D. La. 1997).

19         Each plaintiff's lack of credibility also weighs in this analysis.  *In re Ford*

20   *Motor Co. Bronco II*, 177 F.R.D. at 367-68 (*citing Kline v. Wolf*, 88 F.R.D. 696,

21   700 (S.D.N.Y. 1981)) (finding that a failure to cooperate in discovery precludes a

22   finding that Rule 23(a) has been satisfied); *Apanewicz v. General Motors Corp.*, 80

23   F.R.D. 672, 677 (E.D. Pa. 1978) (class representatives must be "of such a character

24   as to assure the vigorous prosecution or defense of the action"); *Armour v. City of*

25   *Anniston*, 89 F.R.D. 331, 332 (N.D. Ala. 1980) (same).

26         Here, Matuschek was convicted of a drug felony.  (Anderson Dec., Ex.  P

27   [Matuschek Depo.: 87:1-20].)  Moreover, all of the class representatives have

28   failed to adequately respond to critical discovery, including records related to

service, repair and modification of their vehicles, photographs of their vehicles, and postings on newtiburon.com.  (Anderson Dec., Ex. U [HMA's document requests], Ex. A [Schroeder Depo. at 144:3-146:12 - acknowledging he possesses, but did not produce photographs, newtiburon.com postings, and modification records], Ex. F [Sano Depo. at 54:20-55:4, 79:9-82:2, 142:5-143:13 - acknowledging he has thrown away service and repair records even after lawsuit was filed]; Ex. J [Gorman Depo. at 43:24-44:4, 51:6-52:13], Exs. J and K - evidence of Gorman's aftermarket modifications and newtiburon.com postings he testified did not exist]; Ex. P [Matuschek Depo. at 142:21-143:9 - same], Ex. R [Parkinson Depo. at 79:23-80:14 - same].)

## IV.   PLAINTIFFS FAILED TO DEMONSTRATE THAT COMMON QUESTIONS OF FACT OR LAW PREDOMINATE OR THAT CLASS PROCEDURE IS SUPERIOR UNDER RULE 23(B)(3)

A class action may only be certified where questions of law or fact common to the class, if any, predominate over questions affecting the individual members and, on balance, a class action is superior to other methods available for adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3).

### A.   Individual Factual Issues Predominate

#### 1.   Plaintiffs Have Not Established They Can Prove A Common Defect

Established law provides that a class claiming an automobile part is defective cannot be certified unless plaintiffs present credible, class-wide proof of a common defect.  *See, e.g., Walsh v. Ford Motor Company*, 130 F.R.D. 260, 269 (D.D.C. 1990) (denying class certification where plaintiffs did not "present credible class-wide proof that the Ford vehicles in question suffered from some common defect causing" an alleged problem); *In re Ford Motor Co. Bronco II*, 177 F.R.D. at 372-73 (denying class certification where no satisfactory class-wide proof of common defect existed).

-16-

1   The decision in *Samuel-Bassett v. Kia Motors America,* 212 F.R.D. 271

2   (E.D. Pa. 2002), which is repeatedly and misguidedly relied upon by plaintiffs,

3   illustrates their ultimate inability to tie their proposed group of vehicle owners into

4   a cohesive class.  In *Samuel-Bassett,* the court certified a class of owners of

5   vehicles allegedly suffering from inferior brake system performance after finding

6   substantial, credible evidence that the vehicles were experiencing brake defects

7   "before reaching the 5,000 mile mark *regardless* of who was driving them or

8   where or how they were being driven."  *Id.* at 282 (emphasis in original).  The

9   court specifically noted that the record indicated "nothing to suggest that Kia

10  drivers stop and go more than drivers of any other vehicles," and "problems with

11  the [vehicles'] braking system have manifested themselves **regardless of the**

12  **individual driver's habits or circumstances … .**"  *Id.* at 282 n. 2 (emphasis

13  added).[6]

14  Unlike the plaintiffs in *Samuel-Bassett*, the plaintiff class representatives

15  claimed to have clutch issues at widely-varying mileage intervals (*e.g.* Gorman at

16  approximately 2,000 miles on a used vehicle and Sano at approximately 89,000

17  miles on a new vehicle), and their individual circumstances, demonstrated below,

18  amply demonstrate extraordinary driving characteristics and warranty-voiding

19  vehicle modifications and conduct among the putative class.  Four of the five class

20  members have illustrated textbook instances in which abusive driving or relevant

21  vehicle modifications have justified HMA's denial of warranty coverage.

22  Moreover, as set forth in the concurrently-filed declaration of Jason R. Erb, HMA

23  has culled extensive evidence available in the public domain that such driving and

---

24  [6]   Citing *Anthony v. General Motors Corp.*, 33 Cal. App. 3d 699 (1973),
25  plaintiffs suggest that whether a defect exists is exactly the type of common issue
    for which class actions were designed.  The decision by the court in *Anthony*,
26  however, was based largely upon the fact that the federal government, in a separate
    investigation, had already found the alleged part defective.  *Id.* at 707 ("[t]he
27  record before us does show that an agency of the federal government had made
    findings which support plaintiff's theory.")  There has been no such governmental
28  finding here.

1  modifications are common among the putative class.  (Erb Dec., ¶¶1-8 & Exs. 1-

2  10.)  Consequently, the same basis for class certification from *Samuel-Bassett*

3  cannot be found here.

4      Relying solely upon a general reference to a non-existent "flywheel system,"

5  plaintiffs have yet to actually identify which of the several parts of the clutch, *i.e.*,

6  the clutch disc, the pressure plate, the release bearing or the flywheel, they claim is

7  defective or, more fundamentally, how and why the part or parts are allegedly

8  defective.  Plaintiff Schroeder testified he was informed by the dealership that his

9  clutch lining had worn out.  Plaintiff Sano reports he was advised by the dealership

10  that his clutch wore out, but he also claims his mechanic friend told him it was a

11  flywheel problem (after researching the internet and finding his attorneys'

12  advertisement).  When pressed, Sano conceded his mechanic friend did not know

13  what, specifically, was the problem.  Plaintiff Parkinson claims, based on his own

14  visual inspection, that all of the parts were heat scorched and that the flywheel was

15  cracked.  Plaintiff Matuschek claims, based on his own determination, that the

16  flywheel was defective.

17      In summary, plaintiffs have not identified a common defect with a common

18  part.  Most have not retained any allegedly defective part and, with respect to the

19  one that did (Sano), he has, in fact, had some unknown testing done on it.  Further

20  still, two of the plaintiffs (Gorman and Parkinson) improperly drove their cars for

21  considerable distances (100 miles and 30 miles, respectively) before bringing them

22  in for repair.  Sano's mechanic friend blow torched his way into the transmission

23  housing in order to make the repair, and it will be impossible for Sano to

24  demonstrate that any alleged damage was not caused by the repair itself.  In short,

25  each of the plaintiffs have varying, atypical and individualized, if not outright

26  impossible, proof problems.

27      Perhaps in tacit recognition that they cannot, from the actual parts

28  themselves, identify a common defect, let alone prove one on a common basis for

-18-

the reasons discussed above, plaintiffs suggest that they will instead ask a jury to infer a common defect from certain data and discovery responses produced by HMA in this case, which they claim shows an unusually high warranty claim rate. There are several fundamental problems with this proposal, which demonstrate why plaintiffs cannot satisfy their burden of presenting credible, class-wide proof of an allegedly common defect. *(See* HMA's Motion to Strike Evidence.)

First, it is undisputed that there are fifteen different configurations of the clutch parts on the 2003 Tiburon with varying numbers of warranty claims within the proposed class, and plaintiffs did not address, let alone explain, how their purported common inference can apply. *See* Johnson Dec., ¶13; *Kaczmarek v. IBM Corp.,* 186 F.R.D. 307, 312 (S.D.N.Y. 1999) (denying class certification where several different models and configurations were at issue that required a detailed factual inquiry into the differences); *Walsh,* 130 F.R.D. at 270 (finding a lack of predominance given the varying transmissions, varying possible defects, and different model cars of the automobiles at issue).

Second, plaintiffs purport to draw their inference from a Technical Service Bulletin and HMA's responses to discovery requests. Plaintiffs, however, mischaracterize both the substance and purpose of the TSB and the discovery responses to manufacture this allegedly high warranty or failure rate. (Johnson Dec., ¶¶16-25; Brown Dec., ¶¶14-15; Starksen Dec., ¶48 - *"Plaintiffs use a variety of metrics from Hyundai's warranty claims, but, of course, these were claims **paid** by Hyundai and not representative of any group of consumers that are supposedly damaged by Hyundai. More importantly, however, all of the rates proffered by plaintiffs are made in a vacuum. All of the rates are computed from Hyundai data that **does not have any root cause analysis** associated with it. **None of these records describe a stated failure reason or even a pattern of failure reasons, only that claims were paid** - whether from a bona fide failure owing to defect, claims paid despite some indication the vehicle modification or abusive driving, or claims*

-19-

1    *paid entirely as a gesture of goodwill.  Accordingly, in my opinion, this data does*

2    *not explain or suggest a common root cause failure mode among Hyundai Tiburon*

3    *clutches*;" (emphasis added.))

4         Third, as will be discussed below, even if the Court were to accept plaintiffs'

5    unsupported proposal of inferring a common defect from faulty data, the multitude

6    of individual issues raised by driving habits, driving conditions, modifications and

7    individual defenses, all of which are relevant to determining whether an allegedly

8    common defect caused plaintiffs' need for a clutch repair and whether the decision

9    to deny each of them warranty coverage was proper, will predominate.

10        **2.    Individual Issues Will Predominate Respecting the Cause of**

11              **Clutch Issues And Whether Warranty Coverage Was**

12              **Voided And/Or Properly Denied**

13        Plaintiffs must also establish that the yet-to-be identified, allegedly common

14   defect actually caused the need for each of the plaintiffs to have their clutch

15   repaired or replaced; case law provides that proving this on a common basis is not

16   possible.  *See Cox House Moving, Inc. v. Ford Motor Co*, CA No. 7.06-1218-

17   HMH, 2006 WL 3230757, at *8.  (D.S.C. Nov. 6, 2006) (denying certification of

18   warranty claims based on alleged engine defect because "even assuming the

19   existence of a common defect, each engine would have to be examined

20   individually to determine whether that defect caused the problems present in each

21   individuals engine"); *Arabian v. Sony Electronics Inc.*, No. 05-CV-1741

22   WQH(NLS), 2007 WL 627977, at *38-39 (S.D. Cal. Feb. 22, 2007) (determining

23   that individual issues predominated because the alleged defect had "a variety of

24   apparent causes" and it was "not clear that the problems with the [products] of

25   even the two proposed Class representatives were precipitated by the same root

26   cause."); *Sanneman v. Chrysler Corp.*, 191 F.R.D. 441, 459 (E.D. Pa. 2000)

27   (same).

28

-20-

a.  Causation Cannot Be Established On A Class-Wide Basis
Given Individualized Driving Habits And Conditions

Due to the nature of plaintiffs' claims, each individual driver's driving habits and the conditions under which each car was driven will have to be analyzed to determine whether the alleged defect was in fact a cause of each plaintiff's need to have a clutch repaired.  *See American Suzuki Motor Corp. v. Superior Court*, 37 Cal. App. 4th 1291, 1299 (1995) (denying certification where alleged vehicle defect – a tendency to rollover – found to be user-dependent); *Saval v. BL, Ltd.,* 710 F.2d 1027, 1031 (4th Cir. 1983) (denying joinder of warranty claims of four Jaguar vehicle owners where vehicles had differing service and driving histories); *In re GMC,* 2006 WL 1049259, at *10 (noting that "[a]ssuming the plaintiffs can determine whose vehicles have the alleged defect, they then have to prove, likely on a vehicle by vehicle basis, which ones have been damaged.")[7]

Moreover, there is substantial evidence that the representative plaintiffs aggressively drove their cars.  Speeding tickets, accidents, prior racing history, stunt driving, internet postings, and modifications for the express purpose of increasing horsepower all bear this out and illustrate why individualized issues will predominate.  Further still, Sano racked up substantial mileage driving through the hills of Berkeley, and each of the other plaintiffs had varying driving conditions.

In summary, each individual driver's habits and driving conditions will have to be analyzed to determine whether those factors, instead of an unidentified defect in one or more parts of the clutch assembly system, was the cause of each plaintiff's need for a clutch repair.

---

[7]  As set forth above, each plaintiff claimed to have a clutch issue at different mileage, and each was told or deduced that a different part or combination of parts was the cause of their reported problem.

    b. <u>Causation Cannot Be Established On A Class-Wide Basis</u>

      <u>Given Individualized Modifications</u>

As established above, each plaintiff's individual modifications to their respective cars will also have to be analyzed in making a causation determination. These individualized issues will also predominate and preclude class certification. *See Tidwell v. Thor Industries, Inc.* (Civil No. 05-CV-2088-LLBLM), 2007 U.S. Dist. LEXIS 21819, at *25 (S.D. Cal. March 26, 2007) (determining that individual issues predominated because "[s]eparate issues would arise concerning individual plaintiffs who have made modifications to their [vehicles].")

Here, four of the named plaintiffs made some sort of modification to their car, with the primary intention of adding power to the car and thereby stress to the clutch. Whether these modifications impacted the life expectancy of the clutch systems and caused the alleged clutch issues will have to be analyzed on an individual basis, and, as discussed below, these modifications also voided warranty coverage.

    c. <u>Individualized Defenses Will Also Predominate</u>

Each plaintiff is subject to particular defenses which will also have to be analyzed on an individual by individual basis thereby causing individual issues to predominate. *In re GMC*, 2006 WL 1049259, at *10 (finding presence of individual defenses weighed against certification); *Hanon v. Dataproducts Corp.*, 976 F. 2d 497, 508 (9th Cir. 1992) (class certification should not be granted if there is a danger that absent class members will suffer if their representative is occupied with defenses unique to it.")

There is no dispute that Hyundai's warranties exclude warranty coverage for repairs caused by driver abuse and/or modifications, and they exclude coverage when non-genuine Hyundai parts are used for the repair and/or an unauthorized auto shop makes the repair.

As established above, four of the five plaintiffs made some sort of

-22-

1   modification to their cars using aftermarket parts and, in most cases, either

2   installed those parts themselves or had a non-HMA auto shop make the

3   installation.  Such modifications are intrinsically unique.  *See* Erb Dec., Ex.7

4   (Gorman posted comments wondering if his intake modification was installed

5   correctly).  Several abusively drove their cars.  Two of the plaintiffs, Gorman and

6   Parkinson, drove their cars excessive distances after experiencing clutch issues.

7   Several replaced their original clutches with high performance aftermarket parts,

8   some had non-HMA auto shops make the repairs, and Matuschek made the repair

9   himself.  Four of the plaintiffs testified they read and understood their warranties at

10   or near the time of purchase and, before they aggressively drove their cars, made

11   modifications to their cars and used aftermarket parts and/or unauthorized shops to

12   make their clutch repairs.

13       Moreover, Schroeder testified that he never contested the warranty

14   determination made by the dealership, nor did he ever contact HMA about the

15   warranty determination.  Parkinson specifically asked the dealership whether his

16   use of aftermarket parts to make the clutch repair would void his warranty and he

17   was advised there were no guarantees.  Sano testified that after his mechanic friend

18   pulled apart the clutch and made his diagnosis, he reread his warranty and

19   understood that if he had his friend make the repair and/or used aftermarket parts

20   to make the repair, he could void his warranty coverage.  Matuschek declined to

21   bring his car in to a dealer and never once contacted HMA.  He made repairs

22   himself with aftermarket parts and an understanding that doing so could void his

23   warranty coverage.

24       Further still, several of these plaintiffs are subject to a spoliation of evidence

25   defense which could result in either a dismissal of their case entirely or, at a

26   minimum, a jury inference in favor of HMA as a result, *inter alia*, of knowingly

27   discarding service and repair records after this lawsuit was filed and conducting

28   testing on original clutch parts without HMA's knowledge or participation.  *Fitting*

1   *v. Dell, Inc.*, No. CVA06-23-S-LMB, 2008 WL 2152233, *5-6 (D. Idaho May 21,

2   2008); *see also Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993) (noting that

3   "a finding of 'bad faith' is not a prerequisite" to instructing the jury "to draw an

4   adverse inference 'a'gainst the party or witness responsible for the spoliation.");

5   *Cedars-Sinai Medical Center v. Superior Court*, 18 Cal.4th 1, 12 (1998); *Torres v.*

6   *Matsushita Elec. Corp.*, 762 So.2d 1014, 1016-17 (Fla. 5th Dist. Ct. App. 2000);

7   *American States Ins. Co. v. Tokai-Seiki (H.K.), Ltd.*, 94 Ohio Misc.2d 172, 175

8   (1997).

9        Finally, having declined a dealer inspection of his clutch and failing to

10  contact HMA about warranty coverage, Matuschek is subject to the voluntary

11  payment defense. *Western Gulf Oil Co. v. Title Ins. & Trust Co.*, 92 Cal. App. 2d

12  257, 26-65 (1949) (payments voluntarily made, with knowledge of the facts,

13  cannot be recovered); *Randazzo v. Harris Bank Palatine, N.A.*, 262 F.3d 663, 667-

14  71 (7th Cir. 2001) (same); *Scott v. Fairbanks Capital Corp.*, 284 F Supp. 2d 880,

15  894 (S.D. Ohio 2003) (same).[8]

16       In summary, plaintiffs have not demonstrated class-wide proof of a common

17  defect, nor can they do so.  Even if they could, however, there are too many

18  individual factual issues with respect to whether such defect was a cause of any of

19  the plaintiffs' alleged damages, whether the warranty determination was proper,

20  and whether any defenses otherwise preclude plaintiffs' claims for this Court to

21  certify the proposed nationwide class.

22       **3.    Individual Representations And Individual Questions Of**

23             **Reliance Predominate In Plaintiffs' Alleged Scheme To**

24             **Deny Warranty Coverage Claim**

25       Plaintiffs claim that HMA, pursuant to a common scheme, misrepresented

26  ───────────────────

[8]      Similarly, members of the putative class who received warranty coverage as

27  a compromise of a larger clutch repair could be subject to voluntary payment and
    release defenses.  *See* Johnson Dec., ¶21 (HMA warranty data reflects instances of

28  compromised claims).

1  the cause of each of the plaintiffs' clutch issues for purposes of denying warranty

2  coverage.  However, only three of the five class representatives ever even

3  communicated with HMA.  Rather, each plaintiff dealt with an independently

4  owned and operated dealership, and each plaintiff had a different experience when

5  dealing with each respective dealership.  Further, each was told by the dealer or

6  deduced on his own a different problem with his clutch.  HMA does not provide or

7  dictate specific diagnoses for vehicle clutch conditions and, consistent with both

8  industry practice and these plaintiffs' experiences, it rarely gets involved in a

9  dealer's determination of warranty coverage.  (Johnson Dec., ¶¶9-10; Brown Dec.,

10  ¶¶8-12); s*ee also Parks Automotive Group, Inc. v. General Motors*, 237 F.R.D.

11  567, 572 at *16 (D.S.C. 2006) (variations in course of dealing when purchasing a

12  vehicle prevents certification of a class); *Dhamer v. Bristol-Meyers Squibb Co.*,

13  183 F.R.D. 520, 533 (N.D. Ill. 1998) (denying class certification and holding "that

14  a nationwide class [here] is not a superior method for resolving consumer fraud

15  claims because each prospective plaintiff is going to be involved in extensive

16  individualized proceedings whether a consumer fraud class is certified or not.")

17       More fundamentally, plaintiffs have not presented any evidence that the

18  dealerships, let alone HMA, were aware of any common defect (plaintiffs cannot

19  establish that themselves) or that they failed to disclose an allegedly common

20  defect---and it is now past time to do so.  Nor have plaintiffs presented evidence of

21  a common representation regarding the alleged clutch problem, or communications

22  amongst dealers and/or HMA reflecting a scheme to deny warranty coverage.

23  Indeed, it will not be possible to do so since such decisions are determined on a

24  case-by-case basis.  Nor is there evidence of common reliance by each one of the

25  plaintiffs.  Whether there was any wrongful conduct in those cases where warranty

26  coverage was denied will require individual analysis of each plaintiffs' experience,

27  which necessarily precludes class certification.

28

**B.    Application Of Each State's Differing And Varying Consumer Protection, Warranty, And Concealment Laws Precludes A Finding Of Common Legal Issues**

**1.    Certification Is Improper Where All Class Members Are Not Governed By The Same Legal Standards**

It is well-established that variances in state law destroy predominance and preclude certification of a nationwide class.  *See In re Bridgestone/Firestone Tire Pros. Liab. Litig.*, 288 F.3d 1012, 1015 (7th Cir. 2002) ("No class action is proper unless all litigants are governed by the same legal rules"); *Zinser v. Accufix*, 253 F.3d 1180, 1189 (9th Cir. 2001); *Chin v. Chrysler Corporation*, 182 F.R.D. 448, 453 (D.N.J. 1998).  Recognizing this longstanding hurdle to certifying a nationwide class, federal courts routinely deny certification where variations in state laws overwhelm common issues of fact.[9]

In this case, plaintiffs attempt to side-step the legal predominance hurdle by asserting that California law applies to *all claims* asserted by *all potential class members*.  For the reasons discussed below, this contention is meritless.

**2.    The Due Process And Choice Of Law Issues In This Case Overwhelm Any Common Legal Issues**

In order to find that common legal issues predominate, this Court must undertake a due process and choice of law analysis as to each claim by each potential class member.  *Gartin*, 245 F.R.D. at 439; *In re St. Jude Medical, Inc.*, 425 F.3d 1116, 1120-21 (8th Cir. 2005) (reversing certification of class where district court failed to conduct due process analysis as to each member of the class).  Plaintiffs seek a nationwide class as to five different state law claims.  The application of these "very complex choice of law [and due process] issues with

---

[9]    *See, e.g.*, *In re Bridgestone/Firestone*, 288 F.3d at 1015; *Gartin v. S & M NuTec LLC*, 245 F.R.D. 429, 439 (2007); *Zinser*, 253 F.3d at 1189; *Estate of Felts v. Genworth Life Ins. Co.*, No. C06-1419RAJ, 2008 WL 2138435, at *8-10 (W.D. Wash. April 14, 2008).

-26-

1    regard to every class member" is a sufficient basis, by itself, to find that common

2    legal issues do not predominate in this action.  *Gartin*, 245 F.R.D. at 439; *see also*

3    *Castano v. American Tobacco Company*, 84 F.3d 734, 750 (5th Cir. 1996) ("The

4    complexity of the choice of law inquiry also makes individual adjudication

5    superior to class treatment.")

6              **3.      California Law May Not Be Applied To Non-California**

7                       **Class Member Claims**

8              Undertaking the requisite due process and choice of law analysis as to each

9    claim by each potential class member demonstrates that California law may not be

10   applied to all potential class member claims.

11                     a.      The Application Of California Law To All Non-

12                             California Class Member Claims Is Unconstitutional

13             "[I]n nationwide class actions, choice of law constraints are constitutionally

14   mandated."  *Chin*, 2 F.R.D. at 457 (*citing Phillips Petroleum Co. v. Shutts*, 472

15   U.S. 797, 821-23 (1985)).  To apply its law constitutionally to the claims of

16   nonresident class members, California must have "a significant contact or

17   aggregation of contacts to the claims asserted by each member of the plaintiff

18   class, contacts creating state interests, in order to ensure that the choice of

19   [California] law is not arbitrary or unfair."  *Clothesrigger v. GTE Corp., 191 Cal.*

20   *App.* 3d 605, 612-13 (1987) (*citing Shutts,* 472 U.S. at 821-22) (internal quotations

21   omitted)*; see also Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214,

22   225-27 (1999) (application of California's Unfair Competition Law to non-

23   California resident claims violated due process where the place where the class

24   members were "injured" and "injury-producing conduct" occurred outside

25   California); *In re Ford Motor Co. Bronco II*, 177 F.R.D. at 371 (noting due process

26   problems with breach of warranty class action against defendant where vehicles

27   purchased and defects manifested in fifty-one United States jurisdictions).

28   Significantly, Plaintiffs bear the burden of establishing that significant contacts

                                              -27-

1    exist between non-California residents' claims and California.  *Wash. Mut. Bank v.*

2    *Superior Court*, 24 Cal. 4th 906, 921 (2001).

3          Here, each of the alleged injuries and the alleged "injury-producing conduct"

4    took place in the state where each Tiburon was purchased, which, other than for

5    approximately 10% of the Tiburons at issue, was *not* California.  First, the

6    Tiburons were not manufactured in California, but were made in Korea and

7    imported at ports across the United States.  (Johnson Dec., at ¶¶11-12.)  Second,

8    non-California residents purchased their Tiburons at local dealerships outside of

9    California.  (*Id.*)  Third, as established above, the Tiburons were serviced at local

10   dealerships, which had complete authority to make warranty determinations.  Thus,

11   the alleged wrongful conduct of denying warranty claims occurred at local

12   dealerships across the United States, not at HMA's offices in California.  Equally

13   important, because the non-California class members' vehicles were sold and

14   serviced outside California, "there is no basis to conclude any non-Californian

15   expected California law would govern his claim . . . ."  *Norwest*, 72 Cal. App. 4th

16   at 227 n. 16 (expectation of parties is significant to determining whether

17   application of California law would offend due process).

18         Without any evidentiary support, plaintiffs make the unsupported assertion

19   that because HMA is headquartered in California, "all . . . operations which are

20   relevant to the misconduct alleged in the complaint are located in this jurisdiction"

21   (Motion at p. 19), which is insufficient by itself to command application of

22   California law.  *Norwest*, 72 Cal. App. 4th at 226.  More to the point, plaintiffs

23   completely mischaracterize HMA's operational structure.  HMA does not conduct

24   all of its business in California; its sales and service departments are divided into

25   geographic regions, each of which separately attends to and markets HMA's

26   vehicles sold in the United States.  (Johnson Dec., at ¶10.)  Finally, as established

27   above, all of the alleged injury-producing conduct occurred in the state where the

28   Tiburons were purchased and the warranty claims were denied, which, for non-

1  California resident claims, was not California.

2      Similarly erroneous is plaintiffs' baseless conclusion that "it is likely that

3  more Class members reside in California than any other state." (Motion at p. 20.)

4  Contrary to this unsupported assertion, less than 10% of the putative class vehicles

5  were sold in California. (Johnson Dec., at ¶¶11-12.) Indeed, when the Tiburon

6  was launched in 2002, HMA was divided into four regions, and the Western

7  Region, which included California, sold the fewest class vehicles. (Id.)

8      Plaintiffs' attempt to establish a connection between non-California resident

9  claims and California is simply unpersuasive. Accordingly, plaintiffs have failed

10  to satisfy their burden of establishing that the application of California law to each

11  potential class member's claims satisfies due process and, therefore, that California

12  law can be applied to all putative class members' claims.

13          b.      California Law Requires That The Warranty Contract Be

14                  Interpreted According To The Law Where Each Tiburon

15                  Was Purchased

16      Plaintiffs repeatedly acknowledge in their Motion that this case involves the

17  interpretation of each consumer's warranty contract with Hyundai to determine the

18  nature and the extent of the warranties.[10] California's choice of law test for

19  contract claims is statutory. According to California Civil Code section 1646, "[a]

20  contract is to be interpreted according to the law and usage of the place where it is

21  to be performed; or, if it does not indicate a place of performance, according to the

22  law and usage of the place where it is made. Cal. Civ. Code § 1646; *Frontier Oil*

23  *Corp. v. RLI Ins. Co.*, 153 Cal. App. 4th 1436, 1442-43 (2007) ("notwithstanding

24  the application of the governmental interest analysis to *other* choice-of-law issues,

25  ─────────────────

26  [10]    Plaintiffs assert throughout their Motion that this case involves the
interpretation of Hyundai's warranty contract and an analysis of what is covered

27  under the contract. *See* Motion pp. 1, 3, 4, 6, 9, 10, 11. Significantly, the
interpretation of the contract forms the basis for all of plaintiffs' claims which

28  essentially allege that Hyundai engaged in a scheme to misinterpret the contract.

-29-

1    Civil Code section 1646 is the choice-of-law rule that determines the law

2    governing the *interpretation* of a contract") (emphasis in original); *Costco*

3    *Wholesale Corp. v. Liberty Mutual Ins. Co.*, 472 F. Supp. 2d 1183, 1197 (S.D. Cal.

4    2007) (same).

5         As reflected in the purchase contracts submitted herewith, both the place of

6    performance and the place the contract was made is the state where each Tiburon

7    was sold and purchased.  The Tiburons at issue were purchased at local

8    dealership's across each of the fifty states and therefore, the governing law for

9    each class member's contract is the state in which the Tiburon was purchased.  *See,*

10   *e.g.*, *Lantz v. American Honda Motor Co.,* No. 06C5932 2007 WL1424614 (N.D.

11   Ill. May 14, 2004) (in consumer action under California UCL, CLRA and warranty

12   theories, the law of the state of the class representatives' residency - - where

13   motorcycles had been purchased - applied notwithstanding that Honda's

14   headquarters was in California); *Long v. Sears Roebuck & Co.,* 877 F. Supp 8, 12-

15   13 (D.D.C. 1995).  Accordingly, the class claims will unavoidably involve the

16   application of a variety of state contract laws relating to the interpretation of all

17   contractual issues in this litigation.

18              c.    California Choice Of Law Rules Do Not Permit The

19                    Application Of California Law To The Other Claims

20        For issues that are not subject to Section 1646, California follows the

21   "governmental interest approach."  *Gartin*, 245 F.R.D. at 439 n. 8.  In undertaking

22   this analysis, "[t]here is a presumption against California law being given

23   extraterritorial effect when the wrongful act as well as the injury occurred outside

24   California."  *Arabian*, 2007 WL 627977 at *9 (citations omitted).

25        The first step of the governmental interest approach is for the trial court to

26   determine whether the laws of the other states are "materially different" than the

27   relevant California laws.  *Wash. Mut. Bank v. Superior Court*, 24 Cal. 4th at 920.

28   "A state's law is materially different from California law if application of the other

-30-

1   state's law leads to a different result." *Costco Wholesale Corp. v. Liberty Mutual*

2   *Ins. Co.*, 472 F. Supp. 2d 1183, 1200 (S.D. Cal. 2007).

3        There are clearly "material differences" among the laws of the fifty states

4   relating to the causes of action at issue in this litigation. [11]  For instance, for breach

5   of warranty claims, some states require vertical privity, while others do not (*See*

6   *Chin*, 182 F.R.D. at 460; *Cole v. General Motors Corp.*, 484 F.3d 717, 727-28;

7   (5th Cir. 2007)); some states preclude relief for an alleged defect that has not

8   manifested, while others do not (*Chin*, 182 F.R.D. at 460); and there is a variation

9   in state laws relating to providing notice of a breach (*Cole*, 484 F.3d at 729).  *See*

10  Anderson Dec., Ex. V.  These variations are also applicable to the Magnuson-Moss

11  claim, which applies state breach of warranty law. [12]  *Chin*, 182 F.R.D. at 458 n. 5

12  (state breach of warranty law applies to Magnuson-Moss claims).  Furthermore,

13  claims for declaratory relief involve materially different laws across the fifty states

14  as claims for equitable relief "depend[] on Plaintiffs' ability to demonstrate that

15  they have been injured as a result" of the alleged misconduct, which, in this case,

16  invariably involves the application of state breach of warranty law and contract

17  interpretation.  *Chin*, 182 F.R.D. at 458 n. 5.

18  _____

    [11]     Although the Court only needs to find a conflict with only one state, HMA
19  has submitted an Appendix A that outlines some of the variations between
    California law and non-California law for plaintiffs' express warranty (privity,
20  notice, reliance) and consumer protection claims (scienter, reliance, remedies) at
    issue in this litigation.  (*See* Anderson Dec., Ex. V [Appendix A].)

21  [12]     Plaintiffs' Magnuson-Moss claim fails as a matter of law and may not be
    pursued as a class action because plaintiffs failed to exhaust the informal dispute
22  resolution procedures set forth in the Warranty Contract.  *See* 15 U.S.C. §
    2310(a)(3)(C)(ii) ("a class of consumers may not proceed in a class action . . .
23  unless the named plaintiffs initially resort to such [informal dispute settlement]
    procedure[s]."); *Sheris v. Nissan North America, Inc.*, Civ. No. 07-2516, 2008 WL
24  2354908, at *7-8 (D.N.J. June 3, 2008) (dismissing Magnuson-Moss claims for
    failure to exhaust warranty settlement procedures.).  HMA's Owner's Handbook
25  provides for alternative dispute settlement through BBB Auto Line and states:
    "*You must use BBB Auto Line prior to seeking remedies available to you through a
26  court action pursuant to the Magnuson-Moss Warranty Act.*"  (*See* Johnson Dec.,
    Ex. 2 pp. 14-15) (emphasis added).  Plaintiffs admit that they did not exhaust these
27  remedies, and therefore cannot proceed in a class action against HMA.  (*See*
    Compl., at ¶ 81.)

28

1    Finally, consumer protection laws also contain material and substantial

2    differences among the 50 states.  *In re Bridgestone/Firestone, Inc*., 288 F.3d at

3    1018 ("[s]tate consumer-protection laws vary considerably, and courts must

4    respect these differences rather than apply one state's law to sales in other states

5    with different rules."); *Lyon v. Caterpillar, Inc*. 194 F.R.D. 206, 219 (E.D. Pa.

6    2000) (denying certification of nationwide class and analyzing the significant

7    amount of differences between state consumer protection laws); *In re St. Jude*

8    *Medical, Inc*., 425 F.3d at 1120 ("the different states have material variances

9    between their consumer protection laws and Minnesota's.").[13]

10    The second step of the governmental interest approach is to determine "what

11    interest, if any, each state has in having its own law applied to the case."  *Wash.*

12    *Mut. Bank*, 24 Cal. 4th at 920.  "California law acknowledges another state's

13    interest in the application of that state's law where the events giving rise to

14    litigation took place within that state's borders."  *Costco*, 472 F. Supp. 2d at 1201

15    (*citing Orr v. Bank of Am., NT & SA,* 285 F.3d 764, 772 n. 4 (9th Cir.2002)); *see*

16    *also Chin*, 182 F.R.D. at 457.  Thus, at a minimum, every state has an interest in

17    the application of its laws to incidents within its borders.

18    The final step of the governmental interest analysis requires the Court to

19    determine whose interests would be "more impaired" if its law were not applied.

20    *Wash. Mut. Bank*, 24 Cal. 4th at 920.  As discussed above, each state has a strong

21    interest in applying its laws to protect its own citizens.[14]  Conversely, California

22

---

[13]    Specifically, the variances among state consumer protection statutes include,
among other things, whether scienter is required, whether reliance is required, and
whether a consumer can recover treble or punitive damages.  *See* Anderson Dec.,
Ex. V [Appendix A]; *see also Stetser v. TAP Pharmaceutical Products, Inc*., 165
N.C. App. 1, 20-23 (2004) (comparing and contrasting state consumer protection
laws); *In re Worldcom, Inc*.. 343 B.R. 412, 427 (Bankr. S.D.N.Y. 2006).

[14]    The longstanding principle that each state has a substantial interest in
applying their own consumer protection laws to their own residents applies even if
California, or other states, have more consumer-friendly laws because "there might
be important policy reasons behind a state's adoption of more restrictive consumer-
oriented laws . . . ."  *In re Ford Motor Co. Bronco II*, 177 F.R.D. at 371.

-32-

1   has little interest in applying its laws to non-California residents.  *Arabian*, 2007

2   WL 627977, at *9 (noting "presumption against California law being given

3   extraterritorial effect"); *Norwest*, 72 Cal. App. 4th at 226 (The Unfair Competition

4   Law does not support claims by non-California residents where none of the alleged

5   misconduct or injuries occurred in California.); *Costco*, 472 F. Supp. 2d at 1202

6   (holding that where contacts with California are unrelated to the cause of action,

7   "failure to apply California law would minimally impair California's interests.").

8   As set forth above, for all non-California potential class members, the alleged

9   injury and injury-producing conduct occurred outside California.  Furthermore,

10  citizens purchasing vehicles in states other than California reasonably assume that

11  the laws of their own state are applicable to their transactions.  Thus, California

12  does not have a greater interest than other states in having its own laws applied to

13  non-California class members.

14       Accordingly, California choice of law principles preclude the application of

15  California law to all of the claims of each potential class member, and the varying

16  laws of the fifty states apply to each of the claims in the proposed class.

17       **4.      Plaintiffs Fail To Satisfy Their Burden Of Establishing That**

18       **This Case Is Manageable Based On The Differences In**

19       **Applicable Law**

20       Having established that due process and California choice of law rules

21  require the application of the law of the fifty states, and that there are substantial

22  variations in the applicable state laws, plaintiffs bear the burden of demonstrating

23  that the variances in state law are not insuperable obstacles to class certification.

24  *In re Paxil Litigation*, 212 F.R.D. 539, 545 (C.D. Cal. 2003); *Cole*, 484 F.3d 724-

25  25 (predominance requirement not met where plaintiffs failed to undertake the

26  required "extensive analysis" of variations in state law).  Plaintiffs failed to

27  undertake any analysis of the variations in state law, nor have they even attempted

28  to demonstrate to this Court that this case is manageable.  Accordingly, based on

-33-

1   the variations of state laws applicable to all of the claims in all applicable

2   jurisdictions, individual legal issues predominate, and this case is unmanageable as

3   a nationwide class action.

4       **C.    Class Procedure Is Not Superior**

5       Plaintiffs are seeking at least $2,000 in repairs and/or reimbursement - not a

6   nominal sum.  More fundamentally, plaintiffs' claims for punitive damages and for

7   attorneys' fees renders their negative value argument moot.  *See Sanneman v.*

8   *Chrysler Corp.*, 191 F.R.D. 441, 456 (E.D. Pa. 2000) (denying class certification

9   noting that the "ability to recover attorneys' fees or punitive damages belies the

10  projected problems of a negative value suit, and offsets the potential costs

11  associated with individual litigations for relatively small financial amounts"); *In re*

12  *Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 225 (E.D. La. 1998)

13  (same).[15]

14      The assertion that there are no suitable alternatives is equally defective.  The

15  Handbook, at page 10, contains an express promise by HMA to provide an

16  alternative dispute resolution (arbitration) program through the Council of Better

17  Business Bureaus' BBB Auto Line to address disputes by Tiburon owners,

18  including disputes as to warranty coverage.  The BBB Auto Line arbitration

19  process is provided at no cost to consumers and is initiated by consumers by

20  merely placing a phone call to the BBB.  Many Tiburon owners have already

21  availed themselves of this process.  (Johnson Dec., ¶26 - "*In any given year, HMA*

22  *has resolved numerous such consumer complaints through BBB Auto Line*

23  *arbitration.*")

24      Similarly, plaintiffs have failed to meet their burden of demonstrating why

25  ───────────────

[15]   Several courts have rejected class certification in the unfair competition

26  context because the Business & Professions Code § 17200 allows restitutionary
    relief to absent persons without the necessity of class certification.  *Caro v. Procter*

27  *& Gamble Co.*, 18 Cal. App. 4th 644, 661 (1993); *Reese v. Wal-Mart Stores, Inc.*,
    73 Cal. App. 4th 1225, 1239 (1999); *Dean Witter Reynolds, Inc. v. Superior Court*,

28  211 Cal. App. 3d 758, 772-73 (1989).

-34-

1    state lemon law and other individual-type claims are not suitable alternatives.

2    (Johnson Dec., ¶27 & Ex. 5 [records of defense judgments from individual actions

3    by other Tiburon owners]; Anderson Dec., Ex. W [photographs of signs in

4    Maryland dealership that serviced Schroeder's car advising customers' of their

5    legal rights] & Ex. X [lemon law disclosures signed by some of the plaintiffs at

6    time of purchase]); *see Chin*, 182 F.R.D. at 462 ("the administrative remedy

7    provided by [the National Highway Traffic Safety Administration], including

8    recall of vehicles for inspection and/or repair, is *more appropriate* than civil

9    litigation seeking equitable relief and money damages in federal court") (emphasis

10   added).

11      Given the undeniable predominance of individual issues of fact and law in

12   this case, class procedure will simply be unmanageable and, therefore, not superior

13   to readily available alternative means for resolving these issues. *See*

14   *Bridgestone/Firestone, Inc.*, 288 F.3d at 1018 ("Because these claims must be

15   adjudicated under the law of so many jurisdictions, a single nationwide class is not

16   manageable"); *In re GMC*, 2006 WL 1049259, at *11-12 (finding lack of

17   superiority where certification of proposed class "will not advance the efficiency

18   and economy of litigation which is a principal purpose of the procedure").

19   **V.   CONCLUSION**

20      Plaintiffs have failed to meet their burden under Rule 23. Because

21   individual factual and legal issues will predominate there can be little question that

22   class treatment of these clutch claims is not appropriate. Therefore, HMA

23   respectfully requests that this Court deny the instant motion for class certification.

24   DATED: June 27, 2008            BINGHAM McCUTCHEN LLP

25

26                         By: _____

27                           Todd E. Gordinier
                             Attorneys for Defendant Hyundai

28                              Motor America