"O"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

MICHAEL PARKINSON, et al.,      )      SA CV 06-345 AHS (MLGx)
                                )
              Plaintiffs,       )      MEMORANDUM OPINION ON ORDER:
                                )      (1) GRANTING IN PART AND
         v.                     )      DENYING IN PART PLAINTIFFS'
                                )      MOTION FOR CLASS
HYUNDAI MOTOR AMERICA, et al.,) )      CERTIFICATION; AND (2)
                                )      DENYING PARTIES' MOTIONS TO
              Defendants.       )      STRIKE
                                )
_____ )

**I.**

**PROCEDURAL BACKGROUND**

On June 16, 2008, plaintiffs Michael Parkinson, Donn
Schroeder, Michael K. Sano, Eric Matuschek, and Wesley Gorman
(collectively, "plaintiffs") filed a Motion for Class
Certification.  On June 27, 2008, defendant Hyundai Motor America
("defendant") filed opposition and a Motion to Strike and
Objections to Plaintiffs' Purported Statistical Data.  On August 1,
2008, plaintiffs filed a Motion to Strike and Objections to
Declaration of Jason R. Erb and Evidence Attached Thereto in
Support of Defendant's Opposition to Motion for Class
Certification.  On August 6, 2008, plaintiffs filed a reply in

1    further support of the Motion for Class Certification.

2         On September 17, 2008, the Court granted the parties

3    leave to submit supplemental filings in support of their respective

4    positions regarding class certification.  Plaintiffs filed a

5    supplemental reply on September 17, 2008, and defendant filed a

6    supplemental opposition on September 29, 2008.

7         All of the above matters came on for hearing on October

8    20, 2008, at the conclusion of which the Court took the matters

9    under submission.  On November 6, 2008, the Court issued an Order

10   and Minute Order granting in part and denying in part plaintiffs'

11   Motion for Class Certification, noting that a memorandum opinion

12   may follow.  Defendant filed a Petition for Permission to Appeal

13   with the Ninth Circuit on November 21, 2008.  The Court granted in

14   part and denied in part defendant's application for a stay pending

15   appeal on November 24, 2008.[1]

16                              **II.**

17                        **FACTUAL SUMMARY**

18        Defendant is an American subsidiary of Hyundai Motor

19   Company that distributes, markets, sells, and issues warranties for

20   Hyundai passenger vehicles.  (First Am. Consolidated Compl.

21   ("FACC") ¶¶ 13-14.)  In the first quarter of 2002, defendant

22   introduced the 2003 Hyundai Tiburon.  (FACC ¶ 17.)  According to

23   the owner's guide and handbook, the 2003 Hyundai Tiburon came

24   equipped with the "Hyundai Advantage – America's Best Warranty,"

25   which included:  (1) a New Vehicle 60 Months/60,000 Miles Limited

26

27        [1]  The Court granted defendant's request to vacate the
     December 15, 2008, Final Pretrial Conference but denied
28   defendant's application in all other respects.

                              2

Warranty; (2) a New Vehicle 120 Months/100,000 Miles Limited Powertrain Warranty for original owners (60 months/60,000 miles for subsequent owners); and (3) a 12 months/12,000 miles warranty for "[n]ormal maintenance items" found to be "defective in material or workmanship under normal use and maintenance." (Decl. of Eric H. Gibbs ("Gibbs Decl."), Ex. 1 at 16, Ex. 2 at 16-17, 21, 38.) Defendant expressly excluded from coverage any "damage or failure" resulting from negligent maintenance, use of non-Genuine Hyundai Parts, misuse, abuse, accidents, modifications, or alterations. (Gibbs Decl., Ex. 2 at 18, 20.)

Plaintiffs are residents of various states, including California, who purchased a new or used manual-transmission 2003 Hyundai Tiburon GT ("Tiburon"). (Mot. Class Cert. 1.) After purchasing their Tiburons, plaintiffs each experienced problems shifting into and between gears. Each plaintiff then spent roughly $2,000 in replacement parts and repairs.

Michael Parkinson purchased a new Tiburon from an Ohio dealership in May 2003. (Decl. of Jason H. Anderson ("Anderson Decl."), Ex. S at 248.) At approximately 30,000 miles, Parkinson attempted to move his Tiburon from a parking spot but was unable to shift into reverse and had trouble transitioning into other gears. (Anderson Decl., Ex. R at 93:10-21.) Parkinson was able to drive the vehicle home, and, the next morning, drove to a local Hyundai dealership for inspection. (Anderson Decl., Ex. R at 93:14-18.) Later that day, the dealership called Parkinson to inform him that his "clutch had failed and that it would have to be replaced." (Anderson Decl., Ex. R at 105:11-21.) Although Parkinson assumed that the repair would be covered under warranty, the technician

determined that the problem was a "failed" clutch disc, which was not covered. (See Anderson Decl., Ex. R at 107:22-23, 108:20-24.) Parkinson initially disputed the warranty coverage but, ultimately, paid for the repair. (Anderson Decl., Ex. R at 116:4-18, Ex. T at 249-50.)

Donn Schroeder purchased a new Tiburon from a Maryland dealership in March 2003. (Anderson Decl., Ex. B at 57.) At approximately 53,000 miles, he was unable to shift into reverse and took the Tiburon to the dealership for repairs. (Anderson Decl., Ex. A at 75:17-25.) The service technician informed Schroeder that the clutch was worn and needed replacing but the repair would not be covered under the vehicle's warranty. (Anderson Decl., Ex. A at 89:10-14, Ex. E at 106.) Schroeder "didn't question it" and agreed to pay for the repair. (Anderson Decl., Ex. A at 90:8-10.)

Michael K. Sano purchased a new Tiburon from a California dealership in February 2002. (Anderson Decl., Ex. G at 137-38.) At approximately 88,000 miles, during his drive to work, Sano "[c]ouldn't get [the clutch] out of gear." (Anderson Decl., Ex. F at 116:1.) Sano took his Tiburon to a dealership where a service technician test-drove the vehicle and wrote an invoice identifying the problem as a "bad" clutch. (Anderson Decl., Ex. F at 112:11-25.) The technician recommended "replacement of clutch ass[embl]y" at a quoted price of $1,895, but Sano declined. (Anderson Decl., Ex. H at 139.) Instead, Sano had a mechanic friend make the repairs. (Anderson Decl., Ex. F at 115:15-20, 118:5-7, 124:17-23.)

Eric Matuschek, a trained automobile mechanic and professional stuntman, purchased a new Tiburon from a California dealership in March 2003. (FACC ¶ 47; Anderson Decl., Ex. P at

27:1-16, 28:23-24, 29:2-12.)  At approximately 30,000 miles, Matuschek noticed what he thought to be clutch-related problems while driving his Tiburon.  (Anderson Decl., Ex. P at 110:4-18.) He drove the vehicle to his repair shop and began researching the symptoms on the Internet.  (Anderson Decl., Ex. P at 114:5-22.) Matuschek then called a Hyundai dealership whose representative suggested that he bring the car in for inspection; however, Matuschek declined when the representative estimated that the repair would cost roughly $2,600.  (Anderson Decl., Ex. P at 114:23-25, 115:1-5.)  Instead, Matuschek performed the repair himself.  (Anderson Decl., Ex. P at 123:5-25, 124:23-25, 128:15-17, 131:2-12.)

Wesley Gorman purchased a used Tiburon from a Florida Ford dealership in March 2005.  (Def.'s Opp. 9; Anderson Decl., Ex. I at 146.)  At the time of purchase, the vehicle had approximately 41,000 miles on it.  (Anderson Decl., Ex. I at 146.)  In May 2005, Gorman took his Tiburon to a Florida Hyundai dealership to report a "creeping noise" and vibration when shifting.  (Anderson Decl., Ex. J at 70:19-25, 71:1-2.)  The Hyundai dealership told Gorman that the clutch repair was not covered under warranty and suggested that he take the vehicle to the original place of purchase - the Ford dealership - for repairs.  (Anderson Decl., Ex. J at 85:1-7, 88:5-10.)  When the Ford dealership also refused to cover the costs of the clutch repair, Gorman purchased an aftermarket clutch and had a Honda specialty shop perform the repairs.  (Anderson Decl., Ex. J at 85:4-21, Ex. M at 173.)

In March 2004, defendant released a Technical Service Bulletin stating problems with the Tiburon's flywheel and clutch

1    assembly.  (See FACC ¶¶ 30-31.)  On March 22, 2006, Parkinson filed

2    a putative class action against defendant in Orange County Superior

3    Court.  (Not. Removal, Ex. A.)  Defendant filed a Notice of Removal

4    to this Court on April 4, 2006.  At roughly the same time,

5    plaintiffs Gorman, Schroeder, and Sano were in the initial stages

6    of litigating putative class actions against defendant in the

7    Central District of California.  (See Def.'s Mot. to Consolidate 2-

8    3.)  On August 7, 2006, the Court consolidated the cases and

9    appointed interim class counsel.[2]  Plaintiffs filed a First Amended

10   Consolidated Complaint on September 7, 2006, alleging, inter alia,

11   violation of the Consumers Legal Remedies Act, unfair business

12   practices, breach of written warranty under the Magnuson-Moss

13   Warranty Act, and breach of express warranty.  Defendant, after

14   unsuccessfully moving to dismiss the action, filed its answer on

15   April 20, 2007.

16        Plaintiffs argue that the cause of the alleged problems

17   in plaintiffs' vehicles is a defective "flywheel system."  (FACC ¶

18   29.)  In all manual transmission vehicles, "the torque of the

19   engine is connected to the transmission by the clutch assembly."

20   (Decl. of Dirk Starksen ("Starksen Decl.") 3.)  The Tiburon's

21   clutch assembly consists of a dual mass flywheel, a clutch disc,

22   and clutch cover assembly composed of a cover stamping, diaphragm

23   spring, and pressure plate.  (Decl. of Dylan Hughes, Ex. 4 at 5;

24   Starksen Decl. 3.)  The flywheel and clutch cover assembly are

25

26   _____

27        [2]   Another action, Stark v. Hyundai Motor America, CV 06-
     3161 AHS (MLGx), was consolidated pursuant to the Court's August
     7, 2006 order.  Plaintiff Stark did not seek appointment as a
28   class representative.  (Mot. Class Cert. 12 n.6.)

attached to the engine's driveshaft.  (Starksen Decl. 3.)  The
clutch disc is "clamped" between the flywheel and clutch cover
assembly.  (Starksen Decl. 3.)

        "The clutch assembly engages and disengages the engine
from the transmission, enabling the driver to start, stop, idle,
and shift gears."  (Starksen Decl. 4.)  When the driver presses his
foot on the clutch pedal, the clutch disconnects the engine from
the transmission.  (Starksen Dec. 3.)  When the driver releases the
clutch pedal, the clutch becomes fully engaged and connects the
engine to the transmission, thus enabling the automobile to drive.

        "The principal function of the dual mass flywheel is to
absorb minor engine vibrations before they are transmitted to the
driveline where they may create gear rattle."  (Starksen Decl. 3.)
To accomplish this, the dual mass flywheel is divided into two
sections:  a "primary" section that connects to the crankshaft, and
a secondary section attached to the primary section with springs to
isolate and absorb engine vibrations.

        According to plaintiffs, the Tiburon's dual mass flywheel
system "suffers from excessive heat build-up under normal driving
conditions," which, in turn, leads to premature flywheel system
failure, "rendering the vehicle inoperable."  (Pl.'s Supp. Reply 1;
FACC ¶ 29.)

**III.**

**SUMMARY OF PARTIES' CONTENTIONS**

        On May 27, 2008, plaintiffs filed a motion for
certification of a class consisting of:

        All current and former owners or lessees of a
        manual-transmission 2003 Tiburon GT, produced

7

1              on or before April 1, 2003, who paid for a

2              replacement to the flywheel assembly, clutch

3              disc assembly, clutch cover assembly, or clutch

4              release bearing within the applicable warranty

5              period.

6  (Mot. Class Cert. 1.)  Excluded from the class are defendant,

7  Hyundai Motor Company; any affiliate, parent, or subsidiary of

8  defendant or Hyundai Motor Company; any entity in which defendant

9  or Hyundai Motor Company has a controlling interest; any officer,

10 director, or employee of defendant or Hyundai Motor Company; anyone

11 employed by counsel for plaintiffs; any judge to whom this case is

12 assigned, as well as her immediate family or staff; any person who

13 purchased a Tiburon for the purpose of resale; and those pursuing

14 claims for personal injury.  (Mot. Class Cert. 7.)

15 **A.        Plaintiffs' Motion for Class Certification**

16         Plaintiffs each purchased a 2003 Hyundai Tiburon GT after

17 defendant aggressively marketed the vehicle as being protected by

18 "America's Best Warranty."  However, plaintiffs, like thousands of

19 others, have been wrongfully forced to bear the cost of repairing a

20 defective flywheel system.

21         The Court should certify the class because each of the

22 procedural requirements in Fed. R. Civ. P. 23 is satisfied, the

23 class action device is well suited to this case, and a class action

24 will afford a fair and efficient way of litigating the class

25 claims.

26 //

27 //

28 //

1          **1.   Class Treatment is Appropriate Under Rule 23**

2               **a.   Plaintiffs Satisfy Rule 23(a)**

3          Under Fed. R. Civ. P. 23(a), the class must be so

4     numerous that joinder of all members is impracticable (numerosity),

5     there must be questions of law or fact common to the class

6     (commonality), the claims or defenses of the representative parties

7     must be typical of the claims or defenses of the class

8     (typicality), and the representative parties must fairly and

9     adequately protect the interests of the class (adequacy).

10         To satisfy the numerosity requirement, joinder of all

11    parties must be "impracticable," but not necessarily impossible.

12    Negrete v. Allianz Life Ins. Co. of N. Am., 238 F.R.D. 482, 487

13    (C.D. Cal. 2006).  Plaintiffs need not identify with precision the

14    number of class members and may instead rely on reasonable

15    inferences.  Westways World Travel, Inc. v. AMR Corp., 218 F.R.D.

16    223, 233-34 (C.D. Cal. 2003).

17         Plaintiffs' evidence shows that defendant sold 12,652

18    class vehicles, many of which required defective flywheel system

19    repairs that defendant failed to cover under warranty.  Also,

20    defendant sold a large number of replacement flywheels and received

21    numerous complaints from Tiburon owners dissatisfied with the lack

22    of warranty coverage.  These facts evidence a class whose

23    individual members would be too large to join in one action.

24         To satisfy commonality, plaintiffs may show either shared

25    legal issues with divergent facts, or a "common core of facts" with

26    divergent legal remedies.  Dukes v. Wal-Mart, Inc., 509 F.3d 1168,

27    1177 (9th Cir. 2007).  Moreover, the inquiry is qualitative, not

28    quantitative, and one significant issue may warrant certification.

1  Id.; Thomas v. Baca, 231 F.R.D. 397, 400 (C.D. Cal. 2005).  In

2  automobile defect cases, commonality is often found when the most

3  significant question concerns the existence of a defect.  See,

4  e.g., Chamberlan v. Ford Motor Co., 223 F.R.D. 524, 526 (N.D. Cal.

5  2004).

6        Plaintiffs show commonality here because the central

7  issue is whether the Tiburon flywheel system is defective.

8  Plaintiffs' allegations present a number of other common legal and

9  factual questions, including:  (1) whether and to what extent

10  defendant was obligated to repair or replace allegedly defective

11  flywheel systems under the warranty; (2) whether the 12

12  months/12,000 miles warranty for the "clutch lining" applies to the

13  entire clutch disc assembly, as well as the flywheel, clutch cover,

14  and release bearing; (3) whether defendant knew or should have

15  known the flywheel system allegedly was defective; (4) whether

16  defendant had a duty to disclose the alleged flywheel system

17  problems; (5) whether the allegedly undisclosed problems would be

18  material to a reasonable consumer; (6) whether defendant engaged in

19  conduct likely to deceive a reasonable consumer; and (7) whether

20  the alleged failure to disclose or misrepresentations regarding

21  warranty coverage violated the Consumers Legal Remedies Act

22  ("CLRA") or Unfair Competition Law ("UCL").

23        A class representative's claims are typical if they are

24  "reasonably coextensive" with those of the absent class members.

25  Dukes, 509 F.3d at 1184.  Plaintiffs' warranty claims are

26  "reasonably coextensive" with those of the absent class members

27  because plaintiffs and every other class member purchased a 2003

28  Tiburon with a manual transmission, experienced problems related to

1   the defective flywheel system, and paid for the repair out-of-

2   pocket, in violation of the warranty agreement.  Likewise,

3   plaintiffs' consumer protection claims are "reasonably coextensive"

4   with those of absent class members because all claims arise from

5   defendant's common scheme to misrepresent its warranty and withhold

6   internal knowledge of common problems with the Tiburon's flywheel

7   system.

8        To establish that they will fairly and adequately

9   represent the interests of the class, plaintiffs must show that

10  they do not have conflicting interests with the class and that they

11  are represented by qualified, competent counsel.  <u>Id.</u> at 1185.

12  Plaintiffs' interests and those of the unrepresented class members

13  are aligned because each suffered the same injury; there are no

14  conflicts of interest.  Further, plaintiffs are represented by

15  qualified and competent counsel.

16              **b.   The Case is Maintainable as a Class Action**

17                   **Under Rule 23(b)(3)**

18        In addition to satisfying the requirements of Rule 23(a),

19  a party seeking certification must show that the class action fits

20  within one of the categories described in Rule 23(b).  Here,

21  plaintiffs' action meets the predominance and superiority

22  requirements of Rule 23(b)(3).

23        The predominance inquiry hinges on the cohesiveness of

24  the class – whether common legal and factual questions appear more

25  significant than individual legal and factual questions.  <u>Hanlon v.</u>

26  <u>Chrysler Corp.</u>, 150 F.3d 1011, 1022 (9th Cir. 1998).  The legal and

27  factual issues central to plaintiffs' claims are common to all

28  class members.  These include allegations that the Tiburon flywheel

1  system was defective and, thus, that defendant breached its

2  warranty agreements for failing to cover the cost of repair.

3  Further, the scope of coverage under the warranty agreement is a

4  question of contract construction common to all members of the

5  class.  Plaintiffs' UCL and CLRA claims also hinge on common

6  questions of law and fact, including the existence of a known

7  defect, whether defendant had a duty to disclose that defect,

8  whether it failed to do so, whether those undisclosed facts would

9  be material to a reasonable consumer, and whether defendant engaged

10 in conduct likely to deceive a reasonable consumer or comprising a

11 common scheme by applying the 12 months/12,000 miles "clutch

12 lining" warranty limitation to the entire flywheel system.

13         Individual litigation of relatively small damages claims

14 is both a burden on the judiciary and uneconomical for plaintiffs.

15 Hanlon, 150 F.3d at 1023.  Few, if any, of the potential class

16 members in this action could afford individual litigation of their

17 claims, given the disparity between possible recovery and

18 litigation costs.  Therefore, the class action method is superior.

19              **c.  A Nation-Wide Class is Appropriate**

20         A court may certify a nation-wide class for alleged

21 violations of state law.  See Phillips Petroleum Co. v. Shutts, 472

22 U.S. 797, 821, 105 S. Ct. 2965, 86 L. Ed. 2d 628 (1985).  For

23 certification to be proper, application of the state's laws to out-

24 of-state class members must comport with due process.  Once

25 plaintiffs make this showing, the burden shifts to the non-movant

26 to show that the laws of another state apply.  Wash. Mut. Bank, FA

27 v. Superior Court, 24 Cal. 4th 906, 921, 103 Cal. Rptr. 2d 320

28 (2001).

###### i.   Application of California Law Is
###### Constitutional

To satisfy their burden, plaintiffs must show that
California has a significant contact or aggregation of contacts to
the claims of the class members to ensure that California law is
not being applied arbitrarily.  See Wershba v. Apple Computer,
Inc., 91 Cal. App. 4th 224, 244, 110 Cal. Rptr. 2d 145 (2001);
Clothesrigger, Inc. v. GTE Corp., 191 Cal. App. 3d 605, 612-13, 236
Cal. Rptr. 605 (1987).  Here, defendant has a substantial presence
in California, including in-state business practices that form the
core of plaintiffs' allegations.  Additionally, a significant
number of class members reside in California.

Because plaintiffs have already identified significant
contacts, the burden shifts to defendant to show that the laws of
another state apply.  This burden is "substantial" when defendant
is located in California and the alleged misconduct occurred in or
emanated from California.  See In re Activision Sec. Litig., 621 F.
Supp. 415, 430 (N.D. Cal. 1985).  In California, a three-step
"governmental interest" test is used to determine choice of law
questions.  Under the "governmental interest" test, the Court first
determines whether the laws of each potentially concerned state are
different from those of California.  Kearney v. Salomon Smith
Barney, Inc., 39 Cal. 4th 95, 107, 45 Cal. Rptr. 3d 730 (2006).
The Court then "examines each jurisdiction's interest in the
application of its own law."  Id.  If the non-forum state laws
differ from those of the forum state and the non-forum states have
an interest in applying their laws in the action, the Court will
select the law of the state whose interests would be most impaired.

1   Id. at 107-08.

2        Defendant cannot satisfy its burden because California's

3   consumer protection statutes, upon which some of plaintiffs' claims

4   are based, are largely homogeneous with those of the other fifty

5   states and, if anything, afford greater protection to consumers.

6   Even assuming a conflict existed, defendant cannot show that

7   another state has a more substantial interest in having its laws

8   apply to this action.  California has a strong interest in policing

9   wrongful conduct allegedly occurring within its borders, including

10  when the victims of such conduct are out-of-state residents.

11  **B.        Defendant's Opposition**

12       The motion for class certification should be denied

13  because factual and legal issues unique to each plaintiff

14  predominate every facet of the litigation.  Several key background

15  facts illustrate this point.

16       First, individual driver habits and the driving

17  environment impact the lifespan of a clutch.  Second, the purchase

18  and service process is individualized and detached from defendant.

19  For example, the Tiburon was designed and manufactured in Korea by

20  Hyundai Motor Company, then shipped to one of the 794

21  independently-owned Hyundai dealerships throughout the country.

22  Defendant only becomes involved in a warranty determination when a

23  customer disputes a dealer's coverage decision or when a dealer

24  requests assistance with a particularly difficult vehicle

25  diagnosis.

26       Third, clutch-related diagnoses are complex and highly

27  individualized.  Often, the service technician must discuss the

28  symptoms with the customer and road test the vehicle to observe the

1   customer's driving habits.  Like virtually all other automobile

2   manufacturers, defendant does not provide coverage where there is

3   evidence of lack of proper maintenance, abusive driving, a prior

4   accident, or modifications to the vehicle.

5       Fourth, while the class vehicle was in production, there

6   were over fifteen different component configurations of the clutch

7   assembly.

8       Fifth, the Tiburon is one of a handful of inexpensive

9   sports coupe vehicles popular with a dedicated group of "tuner"

10  enthusiasts.  There is widespread evidence of owner modifications

11  to Tiburons, as well as evidence of aggressive and/or abusive

12  driving.  Such evidence is readily available on the Internet, where

13  Tiburon owners post comments, photographs, and videos of their

14  modifications and driving.

15      Sixth, each of the named plaintiffs, who either modified

16  their Tiburons with performance-enhancing parts, exhibited abusive

17  driving, or conducted improper repairs, illustrate the predominance

18  of individual issues.

19      Finally, plaintiffs mischaracterize defendant's Technical

20  Service Bulletins and Quality Information Reports.  Defendant

21  communicates to dealerships through Technical Service Bulletins

22  ("TSBs"), which relay diagnostic changes to a product and technical

23  changes or issues.  Defendant communicates with the parent company

24  through Quality Information Reports ("QIRs"), which convey

25  information and product "brainstorming" from "the field" to Korea.

26  The TSB plaintiffs believe to be an admission of a defect is simply

27  a number change/update to defendant's catalog.

28  //

1  **1.    Plaintiffs Do Not Meet the Requirements of Rule**

2  **23(a)**

3       Certification of a class action is proper only after the

4  Court undertakes a rigorous analysis and determines that the Rule

5  23 requirements have been satisfied.  <u>Gen. Tel. Co. of Sw. v.</u>

6  <u>Falcon</u>, 457 U.S. 147, 161, 102 S. Ct. 2364, 72 L. Ed. 2d 740

7  (1982).

8       Plaintiffs have not demonstrated numerosity because their

9  conclusory statement that an undefined "many" are in the proposed

10 class is insufficient and the class is unascertainable.  <u>See</u> <u>In re</u>

11 <u>Am. Med. Sys., Inc.</u>, 75 F.3d 1069, 1079 (6th Cir. 1996).

12      The remaining Rule 23(a) factors – commonality,

13 typicality, and adequacy – overlap and can be discussed together.

14 To meet these requirements, plaintiffs have simply restated the

15 basic rule and, in conclusory terms, alleged compliance.  <u>See</u> <u>id.</u>

16 at 1080-81.

17 **2.    Plaintiffs Do Not Meet the Requirements of Rule**

18 **23(b)(3)**

19      Under Rule 23(b)(3), plaintiffs must show that common

20 questions predominate and that the class action is a superior means

21 of litigating the case.  Here, individual factual and legal issues

22 predominate, and the class action procedure is not superior to

23 litigate plaintiffs' claims.

24      Plaintiffs have not shown credible, class-wide proof of a

25 common defect.  <u>See</u> <u>Walsh v. Ford Motor Co.</u>, 130 F.R.D. 260, 269

26 (D.D.C. 1990).  The clutch problems occurred at different mileage

27 intervals and under different driving circumstances, and, rather

28 than identify a specific defect, plaintiffs refer generally to the

1    "flywheel system," a term plaintiffs created.  All but one of the

2    plaintiffs failed to retain the replaced parts, and the one who did

3    subjected them to testing.  Even assuming plaintiffs can show the

4    existence of a defect, the Court must still evaluate the multiple,

5    varying reasons for denying each individual warranty claim, as well

6    as whether the defect caused the clutch repairs.  See Cox House

7    Moving, Inc. v. Ford Motor Co., CA No. 7:06-1218-HMH, 2006 WL

8    3230757, at *8 (D.S.C. Nov. 6, 2006).  Plaintiffs also each dealt

9    with defendant differently.  All plaintiffs dealt with independent

10   dealerships, and only some plaintiffs actually contacted defendant

11   directly.  Whether there was any wrongful conduct relating to the

12   denial of warranty coverage will depend on each plaintiff's

13   individual experience.

14        Moreover, each plaintiff will be subject to individual

15   defenses relating to driving habits and vehicle modifications, each

16   of which is grounds for excluding warranty coverage.  Other

17   plaintiffs are subject to spoliation of evidence defenses for

18   knowingly discarding service records and conducting testing on

19   parts without defendant's knowledge.

20        Variations in state laws that overwhelm common issues of

21   fact are sufficient to preclude certification of a nation-wide

22   class.  See Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180,

23   1189 (9th Cir. 2001).  Due process problems will arise if

24   California law is applied to non-California class members.  The

25   state does not have sufficient contacts here because the alleged

26   injury-producing contact occurred in the state where each Tiburon

27   was purchased.  See Clothesrigger, 191 Cal. App. 3d at 612-13.

28        The warranty contract must be interpreted according to

17

the law of the place of performance or where the contract was made. See <u>Lantz v. Am. Honda Motor Co.</u>, No. 06 C 5932, 2007 WL 1424614, at *4-5 (N.D. Ill. May 14, 2007).  As such, the warranty claims will involve the application of a variety of state laws regarding contract interpretation.  Further, using California's "governmental interest" approach, there are material differences in the applicable laws of other states, other states have an interest applying their own laws to incidents that took place within their borders, and each state has an interest in providing redress for its own citizens.  Plaintiffs have failed to meet their burden to show that these obstacles are not insurmountable.

The class action method is not superior because other viable options, including individual litigation and the Council of Better Business Bureau's BBB Auto Line arbitration system, exist for resolution of plaintiffs' claims.

**C.        Plaintiffs' Reply**

Defendant misrepresents plaintiffs' problems as "clutch problems" not covered under warranty when the real issue is failure of the flywheel system.  Plaintiffs' case is about the flywheel system, not the clutch.

Although defendant argues at length that individual issues will predominate as to plaintiffs' warranty claims, it says almost nothing about plaintiffs' consumer protection claims under the UCL and CLRA.

Defendant's TSB suggests that the fifteen clutch configurations resulted from defendant's multiple, failed attempts to remedy the defect.  The different configurations are simply more evidence of a defect.

1    Defendant's "affirmative defenses" do not defeat

2  predominance.  Each is meritless, and courts generally are

3  reluctant to deny certification based on defenses to each

4  individual class member's claims.  <u>Smilow v. Sw. Bell Mobile Sys.,</u>

5  <u>Inc.</u>, 323 F.3d 32, 39 (1st Cir. 2003).  Moreover, the Court has

6  adequate procedural mechanisms for dealing with plaintiffs barred

7  by individual defenses, such as placing those plaintiffs in a

8  separate subclass or excluding them altogether.

9    Contrary to defendant's assertions, plaintiffs do meet

10  the numerosity requirement.  Even accepting defendant's contention

11  that 80% of warranty claims were paid, at least 800 Tiburon owners

12  were denied warranty coverage.

13  **D.**        **Plaintiffs' Supplemental Reply**

14    Defendant's internal reports, which were belatedly

15  produced to plaintiffs, reveal that extensive testing was

16  undertaken on the Tiburon flywheel system.  These tests showed

17  abnormally high temperatures under normal operating conditions.

18  Further, the persuasiveness of defendant's evidence showing fifteen

19  different clutch assembly configurations is questionable because it

20  reveals that only a single vehicle was produced in one of the

21  configurations, and only two vehicles were produced in another.

22  Two others were not class vehicles at all, as they were

23  manufactured with the solution to the flywheel defect described in

24  the TSB.

25  **E.**        **Defendant's Supplemental Opposition**

26    Plaintiffs still have not told the Court what parts of

27  the "flywheel system" are allegedly defective.

28    Plaintiffs' UCL and CLRA claims are not amenable to

1   class-wide determination because they involve individual questions

2   of injury, actual reliance, and policy and practice.  See <u>Gartin v.</u>

3   <u>S&M NuTech LLC</u>, 245 F.R.D. 429, 436 n.4 (C.D. Cal. 2007).

4   Plaintiffs also do not dispute that their Magnuson-Moss claims

5   cannot be certified for class treatment for failure to exhaust

6   administrative remedies.

7                              **IV.**

8                           <u>**DISCUSSION**</u>

9   **A.        Plaintiffs' Motion for Class Certification**

10           **1.   Legal Standard**

11           Certification of a class is proper if:  "(1) the class is

12  so numerous that joinder of all members is impracticable; (2) there

13  are questions of law or fact common to the class; (3) the claims or

14  defenses of the representative parties are typical of the claims or

15  defenses of the class; and (4) the representative parties will

16  fairly and adequately protect the interests of the class."  Fed. R.

17  Civ. P. 23(a).  In addition to the requirements of Rule 23(a), the

18  Court must find that plaintiffs have satisfied at least one of the

19  following conditions:

20           (1) the prosecution of separate actions would

21           create a risk of:  (a) inconsistent or varying

22           adjudications or (b) individual adjudications

23           dispositive of the interests of other members

24           not a party to those adjudications; (2) the

25           party opposing the class has acted or refused

26           to act on grounds generally applicable to the

27           class; or (3) the questions of law or fact

28           common to the members of the class predominate

1    over any questions affecting only individual
2    members, and a class action is superior to
3    other available methods for the fair and
4    efficient adjudication of the controversy.
5  Dukes, 509 F.3d at 1176.  Here, plaintiffs claim that their
6  proposed class action satisfies the third condition of Rule 23(b).
7    A class action may be brought under Rule 23(b)(3) if "the
8  court finds that the questions of law or fact common to the members
9  of the class predominate over any questions affecting individual
10 members, and that a class action is superior to other available
11 methods for the fair and efficient adjudication of the
12 controversy."  Fed. R. Civ. P. 23(b)(3); Hanlon, 150 F.3d at 1022-
13 23.  In making these findings, the Court considers:
14    (A) the class members' interests in
15        individually controlling the prosecution or
16        defense of separate actions;
17    (B) the extent and nature of any litigation
18        concerning the controversy already begun by or
19        against class members;
20    (C) the desirability or undesirability of
21        concentrating the litigation of the claims in
22        the particular forum; and
23    (D) the likely difficulties in managing a class
24        action.
25 Fed. R. Civ. P. 23(b)(3)(A)-(D).
26    Although Rule 23(b)(3) presumes the existence of common
27 issues of fact and law has been established under Rule 23(a)(2),
28 Rule 23(b)(3) focuses on the relationship between the common and

1  individual issues.  <u>Hanlon</u>, 150 F.3d at 1022.  "When common

2  questions present a significant aspect of the case and they can be

3  resolved for all members of the class in a single adjudication,

4  there is clear justification for handling the dispute on a

5  representative rather than on an individual basis."  <u>Id.</u> (citations

6  omitted).

7       The Court has "broad discretion" over whether the moving

8  party has satisfied each Rule 23 requirement, but must also conduct

9  a rigorous inquiry before certifying a class.  <u>Dukes</u>, 509 F.3d at

10  1176, 1177 n.2; <u>see also</u> <u>Gen. Tel. Co. of Sw.</u>, 457 U.S. at 161.  It

11  is the plaintiff's burden to show he satisfies the class

12  certification requirements.  <u>Dukes</u>, 509 F.3d at 1176.

13       **2.  Analysis**

14            **a.  Magnuson-Moss Act**

15       The Magnuson-Moss Warranty - Federal Trade Commission

16  Improvement Act ("MMA") regulates written warranties on consumer

17  products and establishes remedies for consumers.  <u>See</u> 15 U.S.C. §§

18  2301-2312.  The MMA contains an explicit congressional policy

19  statement encouraging "warrantors to establish procedures whereby

20  consumer disputes are fairly and expeditiously settled through

21  informal dispute settlement mechanisms."  <u>Id.</u> § 2310(a)(1).

22  Pursuant to this policy, a "class of consumers may not proceed in a

23  class action . . . unless the named plaintiffs . . . initially

24  resort to [the warrantor's informal dispute settlement mechanism]."

25  <u>Id.</u> § 2310(a)(3)(C)(ii).

26       Certification of plaintiffs' MMA claims cannot be granted

27  because plaintiffs have failed to resort to defendant's informal

28  dispute settlement mechanism, the BBB Auto Line.  Defendant's

1  warranty contract provides that customers "must use BBB Auto Line
2  prior to seeking remedies available to you through a court action
3  pursuant to the [MMA]." (Gibbs Decl., Ex. 2 at 13.)  Plaintiffs do
4  not allege any attempt to use the BBB Auto Line to resolve their
5  MMA claims because, as they assert, such attempts are "unnecessary
6  and/or futile."  (FACC ¶ 81.)

7      Without further elaboration by plaintiffs regarding the
8  alleged futility of the BBB Auto Line process, and given the strong
9  presumption in favor of encouraging alternative dispute resolution
10 under the MMA, the Court concludes that plaintiffs' MMA claims are
11 not certifiable.

12                  **b.    Breach of Express Warranty**

13                       **i.   Rule 23(a)**

14                            **(a)  Numerosity**

15      The numerosity requirement is "discharged if 'the class
16 is so large that joinder of all members is impracticable.'"
17 <u>Hanlon</u>, 150 F.3d at 1019 (quoting Fed. R. Civ. P. 23(a)(1)).

18      Defendant challenges plaintiffs' showing of numerosity as
19 no more than a vague recitation of the general Rule 23
20 requirements.  Plaintiffs point out, however, that, even accepting
21 defendant's assertion that 80% of warranty claims were paid, over
22 800 Tiburon owners were denied coverage for flywheel system
23 problems.  An 800-member class is plainly sufficient to satisfy
24 numerosity under Rule 23(a).  In addition, plaintiffs allege that
25 defendant sold 11,432 class vehicles, received over 1,500
26 complaints from Tiburon owners regarding lack of warranty coverage
27 for clutch assembly repairs, and sold approximately 9,000
28 replacement clutches for class vehicles.  With this factual

1 support, plaintiffs' numerosity allegations are more than mere

2 recitations of Rule 23's requirements.

3       Defendant also argues that the class is unascertainable

4 because defendant has no way of determining which class members

5 were denied warranty coverage and subsequently obtained repairs at

6 a non-Hyundai dealer.  "An identifiable class exists if its members

7 can be ascertained by reference to objective criteria."  <u>In re Wal-</u>

8 <u>Mart Stores, Inc. Wage & Hour Litig.</u>, No. C 06-05411, 2008 WL

9 413749, at *5 (N.D. Cal. Feb. 13, 2008).  The class definition must

10 describe "a set of common characteristics sufficient to allow" a

11 prospective plaintiff to "identify himself or herself as having a

12 right to recover based on the description."  <u>Moreno v. AutoZone,</u>

13 <u>Inc.</u>, 251 F.R.D. 417, 421 (N.D. Cal. 2008) (citation and internal

14 quotations omitted).  "However, 'not all class members need to be

15 ascertained prior to class certification.'"  <u>Mauro v. Gen. Motors</u>

16 <u>Corp.</u>, No. CIV. S-07-892 FCD GGH, 2008 WL 2775004, at *4 (E.D. Cal.

17 July 15, 2008).

18       Here, plaintiffs show that potential class members will

19 be able to objectively determine whether they are a "current [or]

20 former owner[] or lessee[] of a manual-transmission 2003 Tiburon

21 GT, produced on or before April 1, 2003, who paid for a replacement

22 to the flywheel assembly, clutch disc assembly, clutch cover

23 assembly, or clutch release bearing within the applicable warranty

24 period."  The class definition identifies a particular make, model,

25 and production period for the class vehicle, while excluding from

26 the class persons who did not pay for repairs, persons who paid for

27 repairs outside the warranty period, and certain persons affiliated

28 with defendant.  <u>See</u> <u>id.</u>  Because the proposed class definition

1  allows prospective plaintiffs to determine whether they are class

2  members with a potential right to recover, the defined class is

3  sufficiently ascertainable.

4     Accordingly, plaintiffs satisfy the numerosity

5  requirement.

6              **(b)   Commonality and Typicality**

7     The threshold for establishing commonality under Rule

8  23(a) is relatively low. <u>Walsh</u>, 130 F.R.D. at 268.  "It may be met

9  where . . . the claims of every class member are based on a common

10 legal theory, even though the factual circumstances differ for each

11 member." <u>Id.</u>; <u>see also</u> <u>Hanlon</u>, 150 F.3d at 1019 ("The existence of

12 shared legal issues with divergent factual predicates is

13 sufficient, as is a common core of salient facts coupled with

14 disparate legal remedies within the class.").

15    Given the low bar for satisfying Rule 23(a)'s commonality

16 requirement, the Court finds that plaintiffs demonstrate the

17 existence of common legal and factual questions.  Citing

18 defendant's March 2004 TSB and December 12, 2002 QIR, plaintiffs'

19 central common question is whether the 2003 manual-transmission

20 Tiburon suffered from a flywheel defect.  (<u>See</u> Gibbs Decl. Exs. 5,

21 9 at HMA 13524.)  Defendant disputes the meaning plaintiffs

22 attribute to these documents, claiming they reflect little more

23 than routine communications between defendant's various branches

24 and its parent company.  "They are not, as plaintiffs attempt to

25 characterize them, product recall announcements or communications

26 of admitted defects." (Decl. of Steve R. Johnson ¶ 14.)  Whether

27 the TSBs and QIRs show what plaintiffs claim they show is more

28 properly an issue for the trier of fact.  Regardless of the normal

1   or intended use of a TSB or QIR, a jury could find that the

2   documents tend to demonstrate a defect known to defendant when it

3   sold or serviced the class vehicles.  Under plaintiffs' theory, the

4   class members' breach of express warranty claims stem from the

5   existence of this alleged defect and defendant's failure to cover

6   repairs pursuant to the warranty agreement.

7        Typicality is satisfied if "the claims or defenses of the

8   representative parties are typical of the claims or defenses of the

9   class." Fed. R. Civ. P. 23(a)(3).  "'[R]epresentative claims are

10  "typical" if they are reasonably co-extensive with those of absent

11  class members; they need not be substantially identical.'"

12  Chamberlan, 223 F.R.D. at 526 (citation omitted).

13       Plaintiffs' warranty claims stem from the same alleged

14  source:  defendant's known flywheel system defect and failure to

15  cover repairs under warranty.  Accordingly, the typicality

16  requirement satisfied.

17                        **(c)  Adequacy**

18       Adequacy of representation is found where plaintiffs

19  show:  "(1) that the proposed representative Plaintiffs do not have

20  conflicts of interest with the proposed class, and (2) that

21  Plaintiffs are represented by qualified and competent counsel."

22  Dukes, 509 F.3d at 1185.

23       There is no dispute as to the adequacy of class counsel.

24  Additionally, the parties do not argue at length whether the named

25  plaintiffs are adequate representatives.  Plaintiffs have alleged

26  that their interests are aligned with those of potential class

27  members without conflict.  As plaintiffs expounded at hearing, each

28  named plaintiff, like the unnamed class members, experienced

1  problems caused by the alleged defect during the applicable

2  warranty period, each named plaintiff was told by defendant or a

3  dealer that the problem was clutch-related, and each named

4  plaintiff paid for the necessary repairs out of pocket.

5  Accordingly, plaintiffs have shown that their interests are

6  sufficiently aligned with those of the proposed class to satisfy

7  the adequacy requirement of Rule 23(a).

8                        **ii.  Rule 23(b)(3)**

9       A class action may be brought under Rule 23(b)(3) if "the

10  court finds that the questions of law or fact common to the members

11  of the class predominate over any questions affecting individual

12  members, and that a class action is superior to other available

13  methods for the fair and efficient adjudication of the

14  controversy."  Fed. R. Civ. P. 23(b)(3); <u>Hanlon</u>, 150 F.3d at

15  1022-23.

16       Here, assuming the existence of a defect, a host of

17  individual questions regarding warranty coverage preclude a finding

18  that common questions of law and fact predominate.  The Tiburon's

19  warranty expressly excluded from coverage "damage or failure" due

20  to "[n]egligence of proper maintenance," misuse or abuse, use of

21  inferior or non-genuine Hyundai parts, and "[m]odifications,

22  alterations, tampering or improper repair."  (Gibbs Decl., Ex. 2 at

23  18.)  Accordingly, to determine whether each class member's

24  warranty was, in fact, breached, the trier of fact will be required

25  to inquire into the individual circumstances of each alleged denial

26  of warranty coverage.  <u>See</u> <u>Cox House</u>, 2006 WL 3230757, at *5.  If

27  plaintiffs are accurate exemplars of the proposed class, this will

28  involve examining modifications made to the vehicles that might bar

coverage, questioning plaintiffs about their driving habits and evaluating the driving conditions of each class vehicle to determine whether misuse or abuse has occurred, judging the thoroughness of each dealer's inspection, and, as in the case of Matuschek, determining whether the class member ever even attempted to make a warranty claim or was denied coverage.

Given the individual questions underlying plaintiffs' warranty claims, a class action is not superior to individual litigation.  Additionally, plaintiffs have an alternative, free forum for determination of warranty claims through the BBB Auto Line.

The Court, therefore, denies certification for plaintiffs' breach of express warranty claim.[3]

### c.   Plaintiffs' Consumers Legal Remedies Act and Unfair Competition Law Claims

The CLRA outlaws "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."  Cal. Civ. Code § 1770.  Consumers who suffer "as a result of the use or employment by any person of a method, act, or practice" under § 1770 may recover actual damages, injunctive relief, restitution, and punitive damages.  Id. § 1780(a)(1)-(5).

Similarly, the UCL prohibits "unlawful, unfair or fraudulent business act[s] or practice[s] and unfair, deceptive,

---

[3]   Because plaintiffs' fifth cause of action for declaratory relief is premised on the breach of express warranty claim, the Court also denies certification of the declaratory relief claim.

1   untrue or misleading advertising."   Cal. Bus. & Prof. Code § 17200.

2   **i.   Rule 23(a)**

3   **(a)   Numerosity**

4   As discussed above, plaintiffs show that the class is

5   sufficiently numerous to satisfy Rule 23(a)(1).

6   **(b)   Commonality and Typicality**

7   Commonality is satisfied with respect to plaintiffs'

8   claims under the CLRA and UCL.   Commonality will be found where

9   plaintiffs' claims stem from the same alleged source.   <u>Chamberlan</u>,

10   223 F.R.D. at 526.   In <u>Chamberlan</u>, for example, plaintiffs brought

11   suit under the CLRA after Ford Motor Company allegedly failed to

12   inform consumers that certain plastic intake manifolds were

13   defective.   <u>Id.</u>   The court found commonality under Rule 23(a)(2)

14   because the claims of all class members sprang from the same

15   source, "namely, that Ford knew that there was a risk that the

16   plastic intake manifolds would crack prematurely, but concealed

17   that information from ordinary consumers."   <u>Id.</u>

18   Like the plaintiffs in <u>Chamberlan</u>, plaintiffs here allege

19   that their claims stem from the same source:   defendant's alleged

20   knowledge and concealment of a known flywheel system defect at the

21   time the vehicles were purchased or serviced.   Given the permissive

22   standard under Rule 23(a), the Court finds that plaintiffs allege

23   facts sufficient to satisfy the commonality requirement.

24   Typicality also is satisfied because plaintiffs' claims –

25   that defendant deceived customers at the time of purchase or

26   service – are reasonably co-extensive with those of the class.

27   //

28   //

### (c)  Adequacy

For the reasons stated above, plaintiffs are adequate representatives of the class.

### ii.  Rule 23(b)(3)

### (a)  Predominance

Defendant argues that predominance is lacking because "[p]laintiffs' consumer protection claims depend upon the same individual issues related to the elements of their fraud and warranty claims." (Def.'s Supp. Opp. 14.)  Specifically, defendant argues that plaintiffs cannot establish predominance of common questions because plaintiffs are required to prove causation under the CLRA and injury in fact and actual reliance under the UCL. (Def.'s Supp. Opp. 15.)  Plaintiffs, on the other hand, argue that their CLRA and UCL claims "should be certified for class treatment regardless of how the Court opts to treat [p]laintiffs' warranty claims."  (Pl.'s Reply 21.)

### (1)  CLRA

"[T]he causation required by Civil Code section 1780 does not make plaintiffs' [CLRA] claims unsuitable for class treatment." Mass. Mut. Life Ins. Co. v. Superior Court, 97 Cal. App. 4th 1282, 1292, 119 Cal. Rptr. 2d 190 (2002).  For the majority of class members, causation is shown through the materiality of the misrepresentations.  Id. at 1292-93.  If materiality is shown, reliance and causation may be presumed as to the entire class.  Id. at 1293.

Where, as here, the alleged misrepresentations are primarily defendant's failure to disclose problems with the class vehicles, plaintiffs must show that defendant had a duty to

disclose, which, again, may be proven through materiality.  <u>See</u> <u>Falk v. Gen. Motors Corp.</u>, 496 F. Supp. 2d 1088, 1094-95 (N.D. Cal. 2007).  Materiality is determined from the perspective of the reasonable consumer.  <u>Id.</u> at 1095.

Plaintiffs' CLRA claim is based largely on defendant's alleged uniform failure to "disclose numerous facts that a reasonable consumer might find material." (Pl.'s Reply 20.)  Thus, the common questions for determining whether class members may recover under the CLRA include:  (1) whether defendant was aware of the alleged defect; (2) whether defendant had a duty to disclose its knowledge; (3) whether defendant failed to do so; (4) whether the alleged failure to disclose would be material to a reasonable consumer; and (5) whether defendant's actions violated the CLRA. <u>See</u> <u>Chamberlan</u>, 223 F.R.D. at 526-27.  The Court finds that these common questions predominate over any individual issues pursuant to Rule 23(b)(3).

### (2)   UCL

Plaintiffs allege that defendant's practices are unlawful, unfair, and fraudulent in violation of the UCL.  (FACC ¶ 69.)  Thus, plaintiffs' claim falls under all three prongs of the UCL.  <u>See</u> Cal. Bus. & Prof. Code § 17200.  The Court finds that the common questions underlying plaintiffs' UCL claim predominate over individual issues.

Like plaintiffs' CLRA claim, upon which plaintiffs' UCL claim is partially based, common questions include:  (1) whether the flywheel system was defective; (2) whether defendant had a duty to disclose the alleged defect; (3) whether defendant failed to disclose the defect; and (4) whether the failure to disclose would

1  be likely to deceive a reasonable consumer.  See Williams v. Gerber

2  Prods. Co., 523 F.3d 934, 938 (9th Cir. 2008) (under reasonable

3  consumer standard, plaintiff must show that the public is likely to

4  be deceived).  Further, plaintiffs establish that a common question

5  concerns whether defendant was engaged in a scheme to

6  mischaracterize flywheel system problems in order to avoid warranty

7  coverage.

8       Defendant contends that plaintiffs must show injury in

9  fact and, potentially, actual reliance to recover under the UCL.

10 These issues of proof, defendant claims, prevent a finding of

11 predominance under Rule 23(b)(3).

12      A violation of the UCL may be proven "even without

13 allegations of actual deception, reasonable reliance, and damage."

14 Daugherty v. Am. Honda Motor Co., 144 Cal. App. 4th 824, 838, 51

15 Cal. Rptr. 3d 118 (2006).  Rather than show "individualized proof

16 of deception, reliance and injury," plaintiffs must show only that

17 "members of the public are likely to be deceived."  Id.; Mass. Mut.

18 Life Ins. Co., 97 Cal. App. 4th at 1288; see also Falk, 496 F.

19 Supp. 2d at 1098.  Whether class members must prove causation or

20 reliance under the UCL remains an open question.  The issue is

21 currently pending before the California Supreme Court.  See In re

22 Tobacco II Cases, 142 Cal. App. 4th 891, 47 Cal. Rptr. 3d 917

23 (2006), rev. granted, 51 Cal. Rptr. 3d 707, 146 P.3d 1250 (2006);

24 Pfizer, Inc. v. Superior Court, 141 Cal. App. 4th 290, 45 Cal.

25 Rptr. 3d 840 (2006), rev. granted, 51 Cal. Rptr. 3d 707, 146 P.3d

26 1250 (2006).  Notwithstanding this uncertainty and in light of the

27 common questions identified above, the Court finds that plaintiffs

28 establish predominance for the UCL claim.  See Stern v. AT&T

1  Mobility Corp., No. CV 05-8842 CAS (CTx), 2008 WL 4382796, at *12

2  (C.D. Cal. Aug. 22, 2008).

3  **(b)  Superiority**

4          In addition to predominance of common legal or factual

5  issues, plaintiffs must show that the class action method is

6  "superior to other available methods for fairly and efficiently

7  adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "This

8  determination necessarily involves a comparative evaluation of

9  alternative mechanisms of dispute resolution."  Hanlon, 150 F.3d at

10  1023.

11          Absent adjudication on a class basis, plaintiffs must

12  pursue their claims individually.  Although the CLRA, unlike the

13  UCL, permits recovery of both actual damages and punitive damages,

14  Anunziato v. eMachines, Inc., 402 F. Supp. 2d 1133, 1137 (C.D. Cal.

15  2005), litigation costs would likely "dwarf potential recovery."

16  Hanlon, 150 F.3d at 1123.  Further, the burden on the judiciary

17  would be significant and unnecessary, given the existence of

18  questions common to each potential plaintiff's claim.

19          In sum, plaintiffs' CLRA and UCL claims satisfy the

20  predominance and superiority requirements under Rule 23(b)(3).

21  **iii. Choice of Law**

22          When a party seeks to certify a nation-wide class for

23  claims arising under the law of the forum state, that party must

24  show that the forum state has "a 'significant contact or

25  aggregation of contacts' to the claims asserted by each member of

26  the plaintiff class, contacts 'creating state interests,' in order

27  to ensure that the choice of [state] law is not arbitrary or

28  unfair."  Shutts, 472 U.S. at 821-22 (citation omitted).  "[S]o

long as the requisite significant contacts to California exist, a showing that is properly borne by the class action proponent, California may constitutionally require the other side to shoulder the burden of demonstrating that foreign law, rather than California law, should apply to the class claims." Wash. Mut. Bank, 24 Cal. 4th at 921.  Under California's three-step "governmental interest" test, the "foreign law proponent must identify the applicable rule of law in each potentially concerned state and must show it materially differs from the law of California." Id. at 919.  If the Court finds that the relevant laws of other states are materially different, the Court determines "whether each of the states has an interest in having its law applied to the case." Clothesrigger, 191 Cal. App. 3d at 614. Finally, if the first two requirements are met, thus demonstrating the existence of an actual conflict, the Court must "select the law of the state whose interests would be 'more impaired' if its law were not applied." Wash. Mut. Bank, 24 Cal. 4th at 920 (citations omitted).

        Plaintiffs make a sufficient state contacts showing under Shutts to establish that application of California law comports with due process.  In Clothesrigger, the court found sufficient state contacts where defendant did business in California, had its principal offices in California, a significant number of plaintiffs resided in California, and defendant's agents who prepared advertising and other misrepresentations at issue in the litigation were located in the state. Clothesrigger, 191 Cal. App. 3d at 613. Plaintiffs' allegations are almost identical.  Plaintiffs contend that defendant's relevant operations, including its headquarters,

1  marketing department, warranty department, customer affairs

2  department, and engineering department, are located in California.

3  Plaintiffs aver that many of the alleged wrongful acts emanated

4  from defendant's Fountain Valley offices in Orange County,

5  California.  See In re Pizza Time Theatre Sec. Litig., 112 F.R.D.

6  15, 18 (N.D. Cal. 1986).  Additionally, plaintiffs allege that

7  defendant conducts substantial business in the state through its

8  fifty California dealerships.  Finally, given the volume of

9  California automobile sales and the number of in-state dealerships,

10  plaintiffs claim it is likely that more class members reside in

11  California than any other state.  Thus, plaintiffs' alleged

12  contacts are sufficient to satisfy the test under Shutts.

13         Because plaintiffs show that application of California

14  law is constitutional under Shutts, defendant must show that

15  another state's laws apply under the California governmental

16  interest choice-of-law test.  Defendant argues that the laws of the

17  non-forum states are different from those of California, attaching

18  to its opposition an appendix cataloging state-by-state variations

19  involving privity, notice, reliance, scienter, damages, and other

20  elements necessary to plaintiffs' claims.  (See Anderson Decl., Ex.

21  V.)  Citing Washington Mutual Bank, defendant next argues that non-

22  forum states have an interest applying their law to litigation

23  involving events that occurred within their borders.  Finally,

24  defendant argues that California does not have a greater interest

25  than other states applying its law because the incidents at issue –

26  the individual warranty determinations – occurred in other states

27  and, further, customers would reasonably assume the law of the

28  place of purchase would apply.

1    While defendant's arguments are persuasive in the context

2    of plaintiffs' warranty claims in that denials of warranty coverage

3    might accurately be described as occurring in the state where

4    repair was sought, they carry less force when applied to

5    plaintiffs' claims under the CLRA and UCL.  Plaintiffs allege that

6    the wrongful acts underlying those claims emanated from defendant's

7    California headquarters; defendant does not adequately rebut

8    plaintiffs' showing that the representations or omissions made

9    regarding the Tiburon emanated from California.

10    Further, "California's consumer protection laws are among

11    the strongest in the country," and relatively recent California

12    state court decisions "hold that a California court may properly

13    apply the same California statutes at issue here to non-California

14    members of a nationwide class where the defendant is a California

15    corporation and some or all of the challenged conduct emanates from

16    California."  Wershba, 91 Cal. App. 4th at 244.  Thus, the Court

17    does not find a conflict between California's consumer protection

18    laws and the applicable laws of the non-forum states.

19    Finally, the Court recognizes that extraterritorial

20    application of the UCL is improper where non-residents of

21    California raise claims based on conduct that allegedly occurred

22    outside of the state.  See Sullivan v. Oracle Corp., ---F.3d---,

23    No. 06-56649, 2008 WL 4811911, at *10 (9th Cir. Nov. 6, 2008).  In

24    Sullivan, for example, the Ninth Circuit, citing Norwest Mortgage,

25    Inc. v. Superior Court, 72 Cal. App. 4th 214, 85 Cal. Rptr. 2d 18

26    (1999), held "that § 17200 does not apply to the claims of

27    nonresidents of California who allege violations of the FLSA

28    outside California."  Sullivan, 2008 WL 4811911, at *10.  However,

1  extraterritorial application of the UCL is not barred where the

2  alleged wrongful conduct occurred in California.  See Norwest

3  Mortgage, 72 Cal. App. 4th at 224-25.  In light of defendant's

4  alleged in-state conduct discussed above, the Court finds that

5  certification of a nation-wide class for plaintiffs' UCL claim is

6  not barred under the Ninth Circuit's reasoning in Sullivan.

7         Because defendant does not meet its burden under

8  California's governmental interest test with respect to plaintiffs'

9  CLRA and UCL claims and because plaintiffs otherwise make the

10  showing required by Rule 23, nation-wide certification of these

11  claims is warranted.

12  **B.        Defendant's Motion to Strike**

13              **1.    Legal Standard**

14         In determining whether a class is to be certified, the

15  Court looks to parties' allegations and other material "sufficient

16  to form a reasonable judgment on each requirement."  See Blackie v.

17  Barrack, 524 F.2d 891, 901 (9th Cir. 1975).  Though the issue has

18  not been squarely addressed by the Ninth Circuit, certain "courts

19  have held that on a motion for class certification, the evidentiary

20  rules are not strictly applied and courts can consider evidence

21  that may not be admissible at trial."  Rockey v. Courtesy Motors,

22  Inc., 199 F.R.D. 578, 582 (W.D. Mich. 2001); see also Bell v. Addus

23  Healthcare, Inc., No. C06-5188 RJB, 2007 WL 3012507, at *2 (W.D.

24  Wash. Oct. 12, 2007) (noting that the Ninth Circuit has not

25  addressed the evidentiary standard at the class certification

26  stage).  Unlike a summary judgment motion under Fed. R. Civ. P. 56,

27  a motion for class certification is not dispositive and need not be

28  supported by admissible evidence.  Bell, 2007 WL 3012507, at *2

1  (comparing Fed. R. Civ. P. 23 with Fed. R. Civ. P. 56); see also

2  Wiegele v. Fedex Ground Package Sys., Inc., No. 06cv1330, 2008 WL

3  410691, at *11 n.8 (S.D. Cal. Feb. 12, 2008).

4  Still, the Court should not abandon admissibility

5  standards entirely at the certification stage.  For example, when

6  expert reports are cited in support or opposition of certification,

7  the Court need not engage in a full Daubert v. Merrell Dow

8  Pharmaceuticals, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469

9  (1993), analysis; however, the Court should conduct a limited

10  inquiry into the reliability of the expert opinion and its

11  relevance to determining a Rule 23 requirement.  See Dukes, 509

12  F.3d at 1179-80.

13  **2.  Analysis**

14  Defendant seeks to strike what it characterizes as

15  inadmissible statistical data and data comparisons.  This data

16  consists of:

17  (1)  Complaint data relating to the Tiburon and

18  other unrelated vehicles;

19  (2)  Warranty claims data for the Tiburon and

20  other unrelated vehicles; and

21  (3)  Warranty claims data for different Tiburon

22  models and years.

23  (See Gibbs Decl., Exs. 10-12.)  Defendant argues that:  (1) this

24  evidence constitutes inadmissible hearsay; (2) the comparative

25  statistics are irrelevant; and (3) warranty claims are,

26  effectively, settlement negotiations.

27  Given this stage in the proceedings and the applicable

28  evidentiary standard, the Court denies without prejudice

1  defendant's motion to strike.[4]  Defendant's evidentiary objections

2  may be asserted prior to or during trial.

3  **B.        Plaintiffs' Motion to Strike**

4           **1.   Legal Standard**

5           Plaintiffs seek to strike the declaration Jason R. Erb

6  and attachments thereto because defendant allegedly failed to

7  produce this evidence pursuant to its obligations under Fed. R.

8  Civ. P. 26.  Alternatively, plaintiffs claim that the Erb

9  declaration attachments were plainly responsive to several of

10 plaintiffs' requests for production.

11          Rule 26 of the Federal Rules of Civil Procedure requires

12 a party to provide certain initial disclosures and to supplement

13 those disclosures as litigation progresses.  Fed. R. Civ. P. 26(a),

14 (e).  Of relevance here, a party must disclose "a copy – or

15 description by category and location – of all documents,

16 electronically stored information, and tangible things that the

17 disclosing party has in its possession, custody, or control and may

18 use to support its claims or defenses, unless the use would be

19 solely for impeachment."  Fed. R. Civ. P. 26(a)(1)(A)(ii).

20 Additionally, parties must disclose witness information at least

21 thirty days prior to trial.  Fed. R. Civ. P. 26(a)(3).  Under Fed.

22

23          [4]  Defendant cites to Local Rules 7-6 and 7-7 for the
    applicable evidentiary standard.  Local Rules 7-6 and 7-7 require
24  that declarations accompanying motions "contain only factual,
    evidentiary matter and . . . conform as far as possible to the
25  requirements of [Fed. R. Civ. P. 56(e)]."  Defendant's recitation
    of Local Rules 7-6 and 7-7 is accurate; however, neither Local
26  Rule reads as a strict evidentiary and admissibility mandate.
    More importantly, as the courts in <u>Bell</u> and <u>Wiegele</u> noted, a
27  motion under Rule 23, unlike a motion under Rule 56, is not
    dispositive, and the admissibility standards should be applied
28  accordingly.

R. Civ. P. 37(e), the Court may prevent a party from supporting a motion with evidence not produced or supplemented in violation of Fed. R. Civ. P. 26(a) or (e).  Rule 37 vests the Court with broad discretion in sanctioning parties for discovery violations.  8A Wright & Miller, <u>Federal Practice and Procedure</u>, § 2284 (1994 & 2008 Supp.).

       **2.   Analysis**

      Given that the Court is presently deciding the certification issue – a relatively early stage in the proceedings – the Court denies plaintiffs' requested Rule 37 sanctions.  The Erb declaration and attachments are relevant to the certification inquiry in that they tend to counter plaintiffs' claim that common questions will predominate.  Plaintiffs may reassert their objections prior to or during trial and are not prejudiced by the Court's consideration of defendant's evidence in deciding class certification.

      Further, defendant argues persuasively that the printed internet postings were created and published by plaintiffs themselves, suggesting that *plaintiffs* were required to produce the documents in response to defendant's discovery requests. Plaintiffs' motion to strike is denied without prejudice.

//

//

//

//

//

//

//

**v.**

**CONCLUSION**

Accordingly and for the foregoing reasons, the Court grants certification of plaintiffs' claims arising under the UCL and CLRA, denies certification for plaintiffs remaining claims, and denies the parties' respective motions to strike.

IT IS SO ORDERED.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Memorandum Opinion on counsel for all parties in this action.

DATED:  December 12, 2008.

ALICEMARIE H. STOTLER
_____
ALICEMARIE H. STOTLER
CHIEF U.S. DISTRICT JUDGE